**Miriam BEN–SHALOM,
Plaintiff–Appellee,**

v.

**John O. MARSH, Jr., Secretary of the Army, Vance Coleman, Commanding Officer, H.Q. 84th Division, U.S. Army Reserve, and John Allen, Lt. Colonel, Commanding Officer, 5091st U.S. Army Reception Battalion, Defendants–Appellants.**

**Nos. 88–2771, 89–1213.**

United States Court of Appeals,
Seventh Circuit.

Argued May 18, 1989.

Decided Aug. 7, 1989.

As Amended on Denial of Rehearing and Rehearing In Banc Oct. 11, 1989.

Patrick Berigan, Angermeier & Rogers, Milwaukee, Wis., for plaintiff-appellee.

Vincent M. Garvey, Dept. of Justice, Civ. Div., Appellate Section, Washington, D.C., for Vance Coleman, Commanding Officer, H.Q. 84th Division, U.S. Army Reserve.

John E. Fryatt, U.S. Atty., Milwaukee, Wis., Kenneth C. Kohl, Dept. of Justice, Civ. Div., Appellate Section, Washington, D.C., for John Allen, Lt. Colonel, Commanding Officer, 5091st U.S. Army Reception Battalion.

John C. Hoyle, Dept. of Justice, Civ. Div., Appellate Staff, Washington, D.C., for John O. Marsh, Secretary of the U.S. Army.

Arvid E. Roach, II, Jennifer S. Divine, Covington & Burling, Laura A. Foggan, Wiley, Rein, Fielding, Washington, D.C., for Women's Legal Defense Fund amicus curiae.

Nan D. Hunter, William B. Rubenstein, New York City, Gretchen Miller, Milwaukee, Wis., Julie M. Randolph, Martin Buchanan, Remcho, Johansen & Purcell, San Francisco, Cal., for American Civil Liberties Union of Illinois amicus curiae.

Fred M. Blum, Julie M. Randolph, Remcho, Johansen & Purcell, San Francisco, Cal., Donald N. Bersoff, Jenner & Block, Washington, D.C., for American Jewish Congress amicus curiae.

Donald N. Bersoff, David W. Ogden, Jenner & Block, Washington, D.C., for American Psychological Ass'n amicus curiae.

Before WOOD, Jr., EASTERBROOK, and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

This case concerns an avowed homosexual, a lesbian, who has persistently sought and now secured, with district court assistance, reenlistment in the Army.[1] The Army under its regulations seeks to void that reenlistment. As might be expected the issue is controversial, as evidenced by the number of amici curiae all supporting plaintiff Miriam Ben–Shalom.[2] The district court has entered a permanent injunction requiring the Army to continue the reenlistment of plaintiff Ben–Shalom without regard to her sexual orientation.

*Background*

Plaintiff is presently a sergeant in the United States Army Reserve performing duty with the 5091st U.S. Army Reception Battalion in Milwaukee, Wisconsin. There is no complaint about the actual performance of her military duties.

In 1976 plaintiff was discharged from the reserves pursuant to then-existing Army Regulation (AR) 135–178, para. 7–5(b)(6), which provided for the discharge of any soldier who "evidenced homosexual tendencies, desire or interest, but is without overt homosexual acts." Plaintiff promptly filed suit claiming that her discharge under that regulation violated her constitutional rights to free speech and privacy. Judge Evans viewed those regulations as overbroad under the First Amendment, and also as violative of plaintiff's constitutional right to privacy that, in Judge Evans' opinion, protected Ben–Shalom's sexual preferences. There was found no proof of nexus between sexual preference and military capabilities. Plaintiff was ordered reinstated by Judge Evans for the remaining eleven months of her enlistment. *Ben–Shalom v. Secretary of Army*, 489 F.Supp. 964 (E.D. Wis.1980) (*Ben–Shalom I*).

The Army did not appeal and the district court reinstatement order became final. After the Army failed to comply with the reinstatement order plaintiff sought to have the Army held in contempt. The district court, however, declined to enforce the reinstatement order, and instead ordered compensation for plaintiff's uncompleted enlistment term. That response did not satisfy plaintiff. On appeal, this court held in an unpublished order that the district court improperly used the civil contempt proceeding to reopen the legal or factual basis of the original reinstatement order. The district court's judgment was therefore vacated and the case remanded. This court suggested in connection with the remand that the Army's only remedy was pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, but expressed no opinion on the merits of that possible effort. On remand the Army did test that remedy but failed in the district court, and subsequently in this court on appeal. *Ben–Shalom v. Secretary of Army*, 826 F.2d 722 (7th Cir.1987). It was pointed out that a Rule 60(b) motion is no substitute for appeal and cannot be used merely to relitigate the merits of the case. The district court was therefore affirmed in its latest judgment, requiring that plaintiff actually be reinstated for the eleven-month balance of her original enlistment and not just compensated for it. The

---

1. The defendants are collectively referred to as the Army.

2. Filing briefs as amici curiae are American Civil Liberties Union Foundation, Inc., American Civil Liberties Union of Wisconsin Foundation, Inc., American Jewish Congress, Women's Legal Defense Fund, and American Psychological Association.

Army complied, but because protracted litigation delayed her reinstatement significantly, plaintiff's enlistment did not expire until August 1988. That is where the current legal chapter begins.

While still serving her original enlistment (as extended by the district court's order) plaintiff sought to reenlist for another full six-year term. In response, plaintiff's commanding officer notified her in March 1988 that the Army was considering whether she should be barred from reenlistment under AR 140–111, Table 4–2, Rule E, on the ground that she is an admitted homosexual.[3] This is a new regulation, adopted after the prior regulation had been found unconstitutional. It governs the immediate reenlistment or extension of enlistment in the U.S. Army Reserve. That notice further advised plaintiff that her admission of homosexuality gave rise to a presumption that she was a homosexual, and that therefore she had thirty days within which to submit a response rebutting that presumption. In her response to the Army's notice, plaintiff again admitted that she is a lesbian. After considering her response, the Army notified plaintiff on April 7, 1988 that accordingly she was barred from reenlistment.

A month later plaintiff filed this new lawsuit, this time to be heard by Judge Gordon, charging that the regulation, which makes the status of homosexuality a nonwaivable disqualification to reenlistment regardless of conduct, violates plaintiff's constitutional rights under the First and Fifth Amendments. The First Amendment claim was based on the fact that the only evidence of plaintiff's homosexuality was her own admission. Plaintiff argued that the new regulation had the effect of chilling her freedom of expression as she would no longer be able to make statements regarding her sexual orientation, statements that she would otherwise be free to make. Alternatively, plaintiff alleged that the regulation violated her Fifth Amendment right to equal protection of the law because the regulation discriminates on its face against a discrete and insular group to which plaintiff belongs. Plaintiff therefore sought a declaratory judgment that the pertinent part of the regulation is unconstitutional on its face, and asked that the Army be affirmatively enjoined to consider plaintiff's reenlistment application without regard to her sexual orientation.

On August 3, 1988, a few days before plaintiff's extended enlistment was to expire, Judge Gordon granted her a temporary injunction to preserve her enlistment status quo pending final resolution of her case, and ordered the Army to consider plaintiff's reenlistment request without regard to her sexual orientation. The Army did as it was directed by the district court and found plaintiff to be otherwise qualified. However, the Army, instead of granting her a new reenlistment as ordered (which it considered to be a violation of its superseding regulations that had not yet been declared invalid), merely extended plaintiff's original enlistment pending further review. In response plaintiff sought successfully to have the Army held in civil contempt for failing to fully comply with

3. Table 4–2 sets forth certain nonwaivable moral and administrative disqualifications. Rule E sets forth the following disqualification:
E. Questionable moral character, history of antisocial behavior, sexual perversion, homosexuality (includes an individual who is an admitted homosexual but as to whom there is no evidence that they have engaged in homosexual acts either before or during military service, or has committed homosexual acts), or having frequent difficulties with law enforcement agencies. (See note 1.)
Notes:
1. Homosexual acts consist of bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent of obtaining or giving sexual gratification, or any proposal, solicitation or attempt to perform such an act. Individuals who have been involved in homosexual acts in an apparently belated episode, stemming solely from immaturity, curiosity, or intoxication, and absent other evidence that the individual is a homosexual, normally will not be excluded from service. A homosexual is an individual, regardless of sex, who desires bodily contact between persons of the same sex, actively undertaken or passively permitted, with the intent of obtaining or giving sexual gratification. Any official, private, or public profession of homosexuality may be considered in determining whether an individual is an admitted homosexual.

the court's order. A fine of $500 per day was imposed by the district court for plaintiff's benefit. The district court delayed the imposition of the fine to permit the Army time to apply to this court for a stay. Rather than seek a stay, the Army complied with the order of the district court, conditionally reenlisted plaintiff for a new six-year term, and then appealed. Plaintiff's new reenlistment term was subject to the condition that if the district court's order was subsequently vacated, reversed, set aside, or otherwise terminated her new enlistment would be voided.

On January 10, 1989 the district court concluded the matter by holding that the new regulation was unconstitutional on both grounds alleged by plaintiff.[4] Her First Amendment rights were found to have been violated by the Army's reliance only upon her admission of homosexuality without evidence that she had in fact committed homosexual acts. The district court also found that the Army had shown no basis to support its contention that acknowledgement of homosexuality constitutes reliable evidence of propensity to engage in homosexual conduct. In regard to plaintiff's equal protection claim, the district court found that a grouping of individuals based on sexual orientation constitutes a suspect classification, but that it was not necessary to subject that classification to strict scrutiny because, in any event, the new regulation classification was not rationally related to any articulated legitimate governmental interest. Judge Gordon held that any regulation on the subject, in order to be valid, had to be targeted at sexual conduct, not just homosexual orientation.

The Army first appealed from the temporary injunction, and that appeal has been consolidated with its later appeal from the permanent injunction. The constitutionality of the Army's new regulation on homosexuality is now the issue.

*First Amendment Issue*

■ Judge Gordon, in his decision of January 10, 1989, declared AR 140–111, Table 4–2 to be unconstitutional on its face in violation of plaintiff's First and Fifth Amendment rights, and directed the Army to continue plaintiff's reenlistment as previously ordered without regard to her sexual orientation. The district judge noted that the basic Army policy remained the same as it was in 1980, although the applicable regulation had been reworded. He also noted that the Army considers having a homosexual orientation to be incompatible with military service because the Army believes that the admission of homosexuality demonstrates a propensity to engage in homosexual conduct. The Army did not offer evidence that plaintiff has engaged in or attempted to engage in homosexual conduct. The regulation defines a homosexual, the district court also found, merely on the basis of one's sexual desires so that neither the actual commission of a homosexual act, nor the intent to commit one, need be an element in a discharge pursuant to the new regulations.

That view of the new regulation led Judge Gordon to conclude, as Judge Evans had in *Ben–Shalom I,* that plaintiff's proclamations of lesbianism were protected speech. In analyzing the problem the district court sought guidance from *Brown v. Glines,* 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980). In *Brown* an officer challenged an Air Force regulation that required members of that service to obtain approval from the base commander before circulating petitions on an Air Force base. The officer was disciplined for circulating, without approval, a petition directed to Congress. The petition sought a change in the personal grooming standards for Air Force personnel because, among other things, it was claimed the standards caused racial tensions. The Court upheld the regulations as protecting a substantial government interest unrelated to the suppression of free expression, with speech being restricted no more than was reasonably necessary for the government purpose. The substantial government interest was found to be morale, good order, and discipline-military matters that Congress and the Court have recognized require some flexibility be

4. The district court's opinion is reported at 703 F.Supp. 1372 (E.D.Wis.1989).

accorded to military commanders. Justice Brennan, however, in dissent labeled the majority reasons about the special nature and overwhelming importance of military necessity as being merely a series of platitudes. *Brown,* 444 U.S. at 368–69, 100 S.Ct. at 613–14.

Judge Gordon, applying *Brown* to the similar government interests advanced by the Army in the present case, found those interests to be substantial without any serious question. The asserted government interests in the present case are the ability of the military to maintain discipline, good order and morale; foster mutual trust and confidence among service members; insure the integrity of the system of rank and command; facilitate assignment and worldwide deployment of service members who frequently must live and work under close conditions affording minimal privacy; recruit and retain members of military service; maintain the public acceptability of military service; and prevent breaches of security. These enumerated interests are set forth in AR 135–178, sec. 10–2.

Judge Gordon then narrowed the question to whether the pertinent new regulations swept more broadly than reasonably necessary to protect those government interests. The new regulation, he found, was premised on the following policy, also set forth in AR 135–178, sec. 10–2:

> Homosexuality is incompatible with military service. The presence in the military environment of persons who engage in homosexual conduct, or who by their statements demonstrate a propensity to engage in homosexual conduct, seriously impair the accomplishment of the military mission. The presence of such members adversely affects the ability of the service to accomplish the enumerated government interests.

That policy, it was found, targets two groups of people, those who engage in homosexual conduct, and those who demonstrate a propensity to engage in homosexual conduct. The Army contended that plaintiff's admission that she is a lesbian brought her within the latter of the two groups. The district court found that the rewording of the new regulation, as compared with the original regulation found unconstitutional in *Ben–Shalom I,* was insufficient to cure the previous finding of unconstitutionality. It was acknowledged that the new regulation no longer affects those who merely evidence "tendencies" or "interest" in homosexuality, but the new regulation continues "to affect those who by statements that they have a homosexual orientation acknowledge a 'desire' for homosexual conduct." The Army's argument that such a "desire" suggests a propensity to engage in actual homosexual conduct was rejected. Likewise the district court rejected the Army's contention that acknowledgement of being a lesbian without proof of actual homosexual conduct equals reliable evidence of "propensity." For the court to rely on the "obvious connection," and to use "common sense," as urged by the Army, was found by Judge Gordon to be "little more than a euphemism for prejudice." Judge Gordon found that the regulation had "the effect of chilling [plaintiff's] freedom of expression because if the regulation is enforced she will no longer be able to make statements regarding her sexual orientation ...," and that therefore the regulation is "facially violative of the First Amendment."

Judge Gordon's analysis is, as customary, thoughtful and articulate, and finds impressive support in Justice Brennan's dissent in *Brown* and elsewhere. But, being bound by the majority opinion in *Brown,* as we see its application to the present case, we must come to a different conclusion. *Brown,* upheld a regulation prohibiting the circulation of petitions by members of the armed forces, even a petition addressed to the Congress, and in spite of the fact that by statute a soldier has the right to communicate directly with a member of Congress. *Brown,* 444 U.S. at 358, 100 S.Ct. at 601. The *Brown* regulation was found to be constitutional because the regulation protected a substantial government interest, a military interest, unrelated to the suppression of free expression. It was pointed out, in substance, that

> the military is, by necessity, a specialized society separate from civilian society.

Military personnel must be ready to perform their duty whenever the occasion arises. To ensure that they always are capable of performing their mission promptly and reliably, the military services must insist upon a respect for duty and a discipline without counterpart in civilian life.

Speech that is protected in the civil population may ... undermine the effectiveness of response to command. Thus, while members of the military services are entitled to the protections of the First Amendment, the different character of the military community and of the military mission requires a different application of those protections. The rights of military men must yield somewhat to meet certain overriding demands of discipline and duty.... Speech likely to interfere with these vital prerequisites for military effectiveness therefore can be excluded from a military base.

*Brown*, 444 U.S. at 354, 100 S.Ct. at 599 (citations omitted).

We see in those words the common recognition that the military establishment is very different from civilian life. When necessary, the military must be able to protect and defend the United States. That is a most important government mission, a difficult, demanding and complex one. It requires a trained professional force of reliable, loyal, and responsive soldiers of high morale, with respect for duty and discipline, soldiers who can work together as a team to accomplish whatever missions they may be given by their commanders. Civilian society is not subject to those sometimes harsh and specialized military demands, and fortunately need not be because our civilian society can depend on the military, which is. As *Brown* makes clear, Congress and the Supreme Court "have found that the special character of the military requires that civilian authorities accord military commanders some flexibility in dealing with matters that affect internal discipline and morale." *Brown*, 444 U.S. at 360, 100 S.Ct. at 602. We are

directed to be careful not to circumscribe the authority of military commanders to an extent not authorized by Congress. *Brown* holds that "[t]he unrestricted circulation of collective petitions could imperil discipline. We find no legislative purpose that requires the military to assume the risk...." 444 U.S. at 360, 100 S.Ct. at 602. Similarly, we do not believe that the Army must assume the risk that the presence of homosexuals within the service will not compromise the admittedly significant government interests asserted in AR 135–178, sec. 10–2.

Moreover, the new regulation we are now considering is a different regulation from that originally considered in *Ben–Shalom I*. The features then found objectionable have been substantially eliminated. Discharge of a soldier who "evidences homosexual tendencies, desire, or interest" is no longer broadly mandated. *Ben–Shalom I*, 489 F.Supp. at 971. That language was originally construed by the district court to infringe on a soldier's right "to meet with homosexuals and discuss current problems or advocate change in the *status quo* ... [or] to receive information and ideas about homosexuality." 489 F.Supp. at 974. That "tendency" and "interest" language is now gone. If, for example, a soldier desires to meet with homosexuals and discuss current problems or advocate change in the status quo, or to receive ideas about homosexuality, then that soldier, under this new regulation, is free to do so. This is now a new case, and not bound by the doctrines of collateral estoppel or res judicata. What remains in the new regulation is but a bar against persons who either admit a "desire" to commit homosexual acts or who have in fact committed homosexual acts.[5]

We are here concerned with plaintiff's forthright admission that she is a homosexual. That reasonably implies, at the very least, a "desire" to commit homosexual acts. In determining the composition of the armed forces, the Army does not have to take the risk that an admitted homosexu-

---

**5.** As the regulation indicates, isolated instances of homosexual conduct, attributable to curiosity, immaturity or intoxication, will not automatically render the individual involved ineligible for military service.

al will not commit homosexual acts which may be detrimental to its assigned mission. It is not disputed, the plaintiff and the district court agree, that the Army has the right to enforce its regulation [6] prohibiting the actual performance of homosexual acts.[7] *Cf. Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

We see more to the Army's argument about the "obvious connection" and "common sense" approach to homosexuals being integrated into the Army than did Judge Gordon when he labelled the argument a "euphemism for prejudice." At oral argument counsel for plaintiff stated that there was no basis for the Army's homosexual regulations, except prejudice. There no doubt is prejudice against homosexuals both in and out of the Army. That possibly may be abating to a degree. However, the Army should not be required by this court to assume the risk, a risk it would be assuming for all our citizens, that accepting admitted homosexuals into the armed forces might imperil morale, discipline, and the effectiveness of our fighting forces. The Commander–in–Chief, the Secretary of Defense, the Secretary of the Army, and the generals have made the determination about homosexuality, at least for the present, and we, as judges, should not undertake to second-guess those with the direct responsibility for our armed forces. If a change of Army policy is to be made, we should leave it to those more familiar with military matters than are judges not selected on the basis of military knowledge. We, as judges, although opponents of prejudice of any kind, should not undertake to order such a risky change with possible consequence we cannot safely evaluate. The Congress, as overseer of the Army and the other military branches, is also better equipped to make such determinations.

Even if we assume that the present regulation does have a chilling effect on protected speech by discouraging proclamations of homosexuality among the military personnel, we cannot say that that infringement rises to the level of being unconstitutional. As we have noted, the branches of the military have great leeway in determining what policies will foster the military mission, and courts will rarely second-guess those decisions. This deference means, among other things, that policies that might not pass constitutional muster if imposed upon a civilian population will be upheld in the military setting. The Court explained this distinction in *Goldman v. Weinberger*, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986):

> Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps. The essence of military service "is the subordination of the desires and interests of the individual to the needs of the service."
>
> … "[W]ithin the military community there is simply not the same [individual] autonomy as there is in the larger civilian community."

*Goldman*, 475 U.S. at 507, 106 S.Ct. at 1313 (quoting *Orloff v. Willoughby*, 345 U.S. 83, 92, 73 S.Ct. 534, 539, 97 L.Ed. 842 (1953) and *Parker v. Levy*, 417 U.S. 733, 751, 94 S.Ct. 2547, 2559, 41 L.Ed.2d 439 (1974)) (other citations omitted).

In *Goldman*, the Supreme Court upheld a military restriction that directly infringed upon a soldier's religious freedom, protected by the Free Exercise Clause of the First Amendment. An Air Force regulation forbade the wearing of any headcovering indoors and the wearing of any but regulation headcoverings outdoors. Goldman, an Air Force officer, refused to stop wearing

---

**6.** Article 125 Uniform Code of Military Justice (10 U.S.C. § 925).

**7.** In *Dronenburg v. Zech*, 741 F.2d 1388 (D.C.Cir. 1984), the plaintiff was a homosexual seaman, who had admittedly engaged in repeated homosexual acts on the Navy base in violation of the regulations. His discharge was upheld.

his yarmulke, which was a symbol of what all parties conceded to be his deep and genuine commitment to his Orthodox Jewish principles. The Air Force court-martialled Goldman for defying the regulation. The Air Force's justification for the regulation and its enforcement against Goldman—the need for uniformity in military attire-was considered to be a subject best left to professional military people and the legislative branch, even though in the civilian world a similar interest would be insufficient to justify such infringement upon an individual's religious beliefs and practices. The Court stated:

> [W]hen evaluating whether military needs justify a particular restriction ... courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.

*Goldman,* 475 U.S. at 507–08, 106 S.Ct. at 1313–14 (citations omitted). Under this standard, the Army's refusal to reenlist Ben–Shalom because she has declared herself to be homosexual does not cross the line into unconstitutional infringement.

Ultimately, however, Ben–Shalom's First Amendment argument fails because it is not speech per se that the regulation against homosexuality prohibits. Ben–Shalom is free under the regulation to say anything she pleases *about* homosexuality and about the Army's policy toward homosexuality. She is free to advocate that the Army change its stance; she is free to know and talk to homosexuals if she wishes. What Ben–Shalom cannot do, and remain in the Army, is to declare herself to *be* a homosexual. Although that is, in some sense speech, it is also an act of identification. And it is the identity that makes her ineligible for military service, not the speaking of it aloud. Thus, if the Army's regulation affects speech, it does so only incidentally, in the course of pursuing other legitimate goals. "[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." *United States v.*

*O'Brien,* 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672 (1968). In *O'Brien* the Court rejected a First Amendment challenge to a statute that imposed criminal sanctions on a person who "knowingly destroys, knowingly mutilates, or in any manner changes" a draft registration certificate. The Court held that although burning draft cards was symbolic speech, it could yet be barred because the regulation passed this four-prong test:

> a government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679. Because the government has a substantial interest in maintaining an efficient and easily administered system of raising armies, the *O'Brien* Court ultimately held that the government could punish civilians for destroying draft registrations, although doing so would necessarily tend to chill symbolic speech.

The same may be said of this case, except with even more force because of Ben–Shalom's status as a soldier. The Army has determined that the presence of homosexual individuals within its ranks may compromise one or more of its military interests in its mission of protecting this country. Plaintiff can say what she wants to say about homosexuals, but if plaintiff admits she is one, then the Army has the right to say something in response, and that is that she is therefore not acceptable in the armed forces.

Judge Gordon treated this problem as a First Amendment issue. On the assumption that it might be a borderline case we have responded on that basis, but we find absolutely no First Amendment violation. This case, however, does raise legitimate equal protection issues.

*Equal Protection*

 -Judge Gordon's equal protection analysis concisely set forth the general considerations involved as well as could be done. We therefore borrow and paraphrase a part of his decision for our purposes. Our disagreement comes only with his application of equal protection principles in the military context.

Judge Gordon explained that plaintiff claims the regulation to be subject to heightened scrutiny because homosexuals, as defined merely by the status of having a particular sexual orientation and absent any allegations of sexual misconduct, constitute a suspect class. A regulation based on such a classification, plaintiff claims, must fail because it is not necessary to achieve a compelling state end. Alternatively, plaintiff argues that the regulation fails rationally to further a legitimate, articulated government purpose.

The Army contends that the regulation does not violate the Fifth Amendment's equal protection guarantee; it satisfies the test of heightened scrutiny since it furthers compelling government interests. Moreover, the Army argues that homosexuals are not in fact a suspect class. The Army asserts that the correct approach is to uphold the constitutionality of the regulation under the traditional test of deferential scrutiny because the regulation rationally furthers several legitimate government interests.

The Equal Protection Clause of the Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." It is made binding upon the federal government by the Fifth Amendment's Due Process Clause, *Bolling v. Sharpe,* 347 U.S. 497, 498–99, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954), and Fifth Amendment equal protection claims are treated precisely the same as equal protection claims under the Fourteenth Amendment, *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514 (1975).

There are three recognized levels of equal protection review-rational basis, "somewhat heightened review," and "strict scrutiny"—which are described in *Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985). *See also id.* at 469, 105 S.Ct. at 3269 (Justice Marshall's remarks about the classifications). In general, a government regulation will be presumed to be valid under equal protection analysis as long as the classification drawn by the regulation "rationally furthers some legitimate, articulated state purpose." *McGinnis v. Royster,* 410 U.S. 263, 270, 93 S.Ct. 1055, 1059, 35 L.Ed.2d 282 (1973). Under this deferential standard of scrutiny, the classification is tested for a general relationship to the articulated government purpose, and it matters not that an individual member of the burdened class proves to be an exception. *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 310–11, 96 S.Ct. 2562, 2565–66, 49 L.Ed.2d 520 (1976). This judicial deference is grounded in a constitutional presumption that "improvident [classifications] will eventually be rectified by the democratic processes." *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254. However, when a regulation creates classifications based on "factors which are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy," *Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254, then judicial deference gives way to heightened scrutiny.

Judge Gordon reasoned that the debate over whether sexual orientation constitutes a suspect or quasi-suspect classification has been obscured by a failure to differentiate adequately between a classification based on conduct and one based on status. In his view the regulation at issue creates a classification based entirely on status. AR 140–111, Table 4–2, as Judge Gordon sees it, cannot be characterized as a classification based on conduct. The issue framed before the district court was whether homosexuals, defined by the status of having a particular sexual orientation and absent any allegations of sexual misconduct, constitute a suspect or quasi-suspect class.

Here we must depart from Judge Gordon's analysis, in which he found that homosexuals constitute a suspect class, justifying heightened scrutiny of the regulation, and that the regulation fails to pass even the most deferential standard of review. Judge Gordon viewed the regulation as creating a classification based entirely on sexual orientation, mere status, and not conduct. Plaintiff is not, however, in the same circumstances as the soldier in *Rich v. Secretary of Army*, 735 F.2d 1220 (10th Cir.1984), who claimed that he was confused at one time about his sexual identity, that his sexual identity did not crystalize until after his enlistment, and that his earlier experiences had been heterosexual followed only by isolated homosexual episodes. In the present case, plaintiff is an admitted lesbian, there is no confusion about that. Her declaration indicates more than a mere homosexual tendency or interest, former criteria eliminated in the new regulation. The regulation now refers to one "who desires bodily contact between persons of the same sex" and "with the intent of obtaining or giving sexual gratification." By admitting to being a lesbian, plaintiff admits to what the regulation prohibits.

It is true that actual lesbian conduct has not been admitted by plaintiff on any particular occasion, and the Army has offered no evidence of such conduct. Judge Gordon found no reason to believe that the lesbian admission meant that plaintiff was likely to commit homosexual acts. We see it differently. Plaintiff's lesbian acknowledgement, if not an admission of its practice, at least can rationally and reasonably be viewed as reliable evidence of a desire and propensity to engage in homosexual conduct. Such an assumption cannot be said to be without individual exceptions, but it is compelling evidence that plaintiff has in the past and is likely to again engage in such conduct. To this extent, therefore, the regulation does not classify plaintiff based merely upon her status as a lesbian, but upon reasonable inferences about her probable conduct in the past and in the future. The Army need not shut its eyes to the practical realities of this situation, nor be compelled to engage in the sleuthing of soldiers' personal relationships for evidence of homosexual conduct in order to enforce its ban on homosexual acts, a ban not challenged here. Plaintiff does not deny that she has engaged or will engage in homosexual conduct. Plaintiff has admitted that she has a homosexual desire, but not necessarily that she intends to commit homosexual acts. The Army need not try to fine tune a regulation to fit a particular lesbian's subjective thoughts and propensities.

■ Judge Gordon held that the Army's regulation failed equal protection analysis even under the most deferential standard of review. In our view, however, it is the deferential standard of review that is applicable and the Army satisfies that standard without any difficulty. *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), arose from a state criminal case unrelated to the military, but nevertheless it has an impact on the Army's classification of homosexuals. *Hardwick*, a five to four decision, was a suit for declaratory judgment brought by Hardwick challenging a Georgia statute which criminalized sodomy. Hardwick anticipated being charged under the statute after engaging in sodomy with another consenting adult male while in the privacy of his own home. Although the Court analyzed the constitutionality of the statute on a due process rather than an equal protection basis, *Hardwick* nevertheless impacts on the scrutiny aspects under an equal protection analysis. The majority held that the Constitution confers no fundamental right upon homosexuals to engage in sodomy. If homosexual conduct may constitutionally be criminalized, then homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny for equal protection purposes.[8] The Constitution, in light of *Hardwick*,

8. Any additional scrutiny is presently reserved for classifications by race, alienage, national origin, gender and illegitimacy. *Cleburne v. Cle-burne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).

cannot otherwise be rationally applied, lest an unjustified and indefensible inconsistency result.

Furthermore, even the dissenters in *Hardwick* did not necessarily preclude all regulation of homosexuality. Justice Blackmun, in dissent in *Hardwick*, described the issue as "the right to be left alone," contending that such conduct falls within a "certain private sphere of individual liberty to be kept largely beyond the reach of government." 478 U.S. at 203, 106 S.Ct. at 2850. Justice Blackmun also noted, however, that the homosexual act involved in *Hardwick* occurred in a private home and did not interfere with the rights or interests of others. 478 U.S. at 206, 106 S.Ct. at 2852. The present case involves entirely different circumstances; plaintiff is a member of the armed forces and her conduct, at the very least, has an impact upon other soldiers. Justice Blackmun's comments in *Hardwick*, whatever their merit in the civilian world, are clearly not applicable to a lesbian in the military service. The privacy expectations of a civilian, wherever their outer limit may be, cannot be compared to the substantially more limited privacy expectations accompanying military life. Plaintiff in the present case voluntarily sacrificed much personal privacy and liberty by deliberately seeking to be in the Army where privacy and liberty are necessarily at a premium.

In a recent *en banc* case, *Watkins v. United States Army*, 875 F.2d 699 (9th Cir.1989), the Ninth Circuit considered a case somewhat similar to the present case. The *Watkins* majority held that the Army was equitably estopped from refusing to reenlist Watkins on the basis of his homosexuality because the Army had overlooked his homosexuality in the past. Estoppel was not made an issue in the present case, although possibly it could have been. Therefore, although we find the Ninth Circuit's estoppel application doubtful, we need not reach that issue.

Judge Norris, however, in a concurrence joined by Judge Canby, would have decided *Watkins* against the Army on equal protection grounds. Judge Norris stated that homosexuals are entitled to suspect class protection. Discrimination against homosexual orientation, he reasoned, is "about as complete as one could imagine" under the regulations. *Watkins*, 875 F.2d at 716. Judge Norris disregarded *Hardwick* because it was decided on due process, not equal protection grounds. *Padula v. Webster*, 822 F.2d 97 (D.C.Cir.1987), was also considered by Judge Norris. The *Padula* court rejected an equal protection challenge to the FBI's policy of not hiring homosexuals. That holding was likewise rejected by Judge Norris on the basis that the *Padula* court summarily rested its decision on the false premise that *Hardwick* foreclosed any finding that homosexuals are a suspect class. We, however, find no fault with *Padula* and believe its equal protection reasoning to be as applicable to the Army as to the FBI.

Judge Norris further rejected the Army's asserted justifications because he explained that they illegitimately cater to private biases. *Watkins*, 875 F.2d at 728. We respectfully disagree, as we believe that this particular classification is supported by military considerations and should be left to the Army. We do not believe that the concerns set forth in the military policy and regulation can be so easily dismissed as mere prejudice, though individual prejudice no doubt exists in the military and elsewhere. The new regulation, we find, clearly promotes a legitimate government interest sufficient to survive rational basis scrutiny. We agree with Judge Hall, who wrote in dissent in *Watkins*, that "[t]here is no doubt that the majority's intrusion into military affairs, unjustified by important federal interests, will have a disruptive effect upon military discipline." *Watkins*, 875 F.2d at 736. We need not pursue all the equal protection avenues thoroughly explored by Judge Norris in his concurrence as we find them unpersuasive in the military context. On this controversial subject unanimity is not to be expected as respectable arguments may be made on both sides of the issue.

Homosexuals have suffered a history of discrimination and still do, though possibly now in less degree. We do not see, how-

ever, that the new regulation embodies a gross unfairness in the military context so inconsistent with equal protection as to be termed "invidious." In these times homosexuals are proving that they are not without growing political power. It cannot be said "they have no ability to attract the attention of the lawmakers." *Cleburne*, 473 U.S. at 445, 105 S.Ct. at 3257. A political approach is open to them to seek a congressional determination about the rejection of homosexuals by the Army.[9] We are, however, unwilling to substitute a mere judge-made rule for the Army's regulation or to act in an executive or legislative fashion.

*Conclusion*

*Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973), arose out of tragic events in 1970 at Kent State University in Ohio. The issue on appeal concerned the training, weaponry, and orders in the Ohio National Guard. Although *Gilligan* may be a much clearer case than the present one, *Gilligan* plainly sets forth the general policy for courts to follow in approaching military matters:

> It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches directly responsible—as the Judicial Branch is not—to the electoral process. Moreover, it is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches. The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability. It is this power of oversight and

control of military force by elected representatives and officials which underlines our entire constitutional system....

413 U.S. at 10, 93 S.Ct. at 2445. We find these principles, though the facts are considerably different, nevertheless to be as applicable to the present case as they were in *Gilligan*, and we have sought to apply them.

This case accordingly is reversed and remanded to the district court for the vacation of any contempt order against the Army that may remain, for dissolution of the permanent injunction, and for dismissal of the case. The Army shall be at liberty to apply its current regulation to plaintiff's conditional reenlistment in accordance with this opinion. The parties shall bear their respective costs.

REVERSED AND REMANDED.

**9.** Homosexuals are not without political power. *Time* magazine reports that one congressman is an avowed homosexual, and that there is a charge that five other top officials are known to be homosexual. Carlson, *How to Spread a Sexual Smear*, Time, June 19, 1989, at 33. Support for homosexuals is, of course, not limited to other homosexuals. The *Chicago Tribune*, on Monday, June 26, 1989, reported that the Mayor of Chicago participated in a gay rights parade on the preceding weekend.