943 F.2d 989
 57 Empl. Prac. Dec. P 40,940, 60 USLW 2141
 Dusty PRUITT, Captain, U.S.A.R., Plaintiff-Appellant,
v.
Richard CHENEY,* Secretary of Defense;
Michael P.W. Stone,** Secretary of the
Army; Ronald W. Zeltman, Brigadier General, Commanding
Officer U.S. Army Reserve Components Personnel and
Administration Center, St. Louis, Missouri, Defendants-Appellees.
 No. 87-5914.
 United States Court of Appeals,
Ninth Circuit.
 Submitted April 27, 1990.
Argued Aug. 5, 1988.
Decided Aug. 19, 1991.
 
 Mary Newcombe, Christopher G. Caldwell, Hedges and Caldwell, Jon Davidson, Paul Hoffman, Susan McGreivy, ACLU Foundation of Southern California, Los Angeles, Cal., for plaintiff-appellant.
 E. Roy Hawkens, U.S. Dept. of Justice, Washington, D.C., for defendants-appellees.
 Paula Ettelbrick, Mickey Wheatley, Lambda Legal Defense and Educ. Fund, New York City, Charles T. Bumer, Nat. Lawyers Guild, San Diego, Cal., for amici curiae.
 Appeal from the United States District Court for the Central District of California.
 Before FLETCHER, CANBY and O'SCANNLAIN, Circuit Judges.
 CANBY, Circuit Judge:
 
 
 1
 Appellant, Reverend Dusty Pruitt, appeals from the district court's dismissal, pursuant to Fed.R.Civ.P. 12(b)(6), of her first and fifth amendment challenges to Army regulations requiring her discharge from the U.S. Army Reserve (USAR) because of her acknowledged homosexuality. We affirm in part and reverse in part.
 
 BACKGROUND
 
 2
 The facts of this case are not in dispute. Reverend Pruitt served in the U.S. Army between January 1971 and July 1975, ultimately rising to the rank of Captain. After leaving active service to seek ordination as a methodist minister, Pruitt remained an officer in the U.S. Army Reserve (USAR). On May 25, 1982, Pruitt was notified of her selection for promotion to the rank of Major effective February 6, 1983. Pruitt's outstanding record in both active and reserve service is undisputed.
 
 
 3
 On January 27, 1983, the Los Angeles Times published an interview with Pruitt which revealed that she was a lesbian and had twice gone through ceremonies of marriage to other women. The article focused on Pruitt's struggle to resolve personal contradictions between her religion and military career, and her sexuality. Through this article the Army first learned of Pruitt's homosexuality. On the basis of this information, the Army suspended Pruitt's promotion to Major pending an investigation to determine whether Pruitt should be separated from the Army Reserve pursuant to AR 135-175, which mandates the discharge of homosexual servicemembers.
 
 
 4
 On April 4, 1983, Pruitt filed this action in district court. In her complaint, Pruitt declared that she was homosexual. She alleged, however, that the Army was barred by the first amendment from discharging her solely on the basis of her admission of homosexuality.[1] The district court denied the Army's motion to dismiss without prejudice and stayed the action pending completion by the Army of its administrative investigation.
 
 
 5
 On April 17, 1984, the Army advised Pruitt of its intention to revoke her security clearance on the ground that "substantial evidence of record [supports the conclusion] that you are a practicing homosexual (lesbian) as defined by paragraph 2-38, AR 135-175."[2] Pruitt responded on May 16, 1984 by letter to the Army contesting the proposed revocation of her clearance. In the letter, Pruitt again admitted her homosexuality:
 
 
 6
 I am a homosexual. I do not believe that as a homosexual woman, I am a security risk; therefore, I cannot see what the matter of my being a homosexual has to do with my security clearance....
 
 
 7
 Although the record is clear that Pruitt is homosexual, there is no evidence in this case that she engaged in homosexual acts, or made any advance toward any active or reserve soldier that might be construed as homosexual conduct.
 
 
 8
 An Army Administrative Board ("Board") convened on September 7, 1985 to determine whether sufficient evidence supported the conclusion that Pruitt was homosexual. The Board accepted into evidence the following: Pruitt's Complaint for Declaratory Relief filed April 4, 1983 (in which she declared she was homosexual); the Los Angeles Times article; the letter of May 16, 1984 in which Pruitt explicitly informed the Army of her homosexuality; and Pruitt's military record. Pruitt attended the proceeding and was represented by legal counsel, but she refused to testify before the board. She made no effort to challenge the veracity of the newspaper articles, or to explain what she meant when she identified herself as homosexual. The Board concluded that Pruitt was a homosexual within the meaning of AR 135-175, and recommended that she be honorably discharged.[3] The Board's recommendation was accepted by the review authority of the Department of the Army and Pruitt received an honorable discharge on July 9, 1986.
 
 
 9
 Upon learning of the discharge, Pruitt renoticed her motion for summary judgment, and the Army responded by renewing its motion to dismiss. The district court denied Pruitt's motion for summary judgment, and granted the Army's motion to dismiss, 659 F.Supp. 625, stating that the Army's determination that homosexual personnel are incompatible with its military mission is entitled to substantial deference. This appeal followed.
 
 
 10
 We withdrew this case from submission pending the en banc decision of this court in Watkins v. United States Army, 875 F.2d 699 (9th Cir.1989), cert. denied, --- U.S. ----, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990), a case raising an equal protection challenge to regulations similar to those challenged by Pruitt. Watkins was decided on May 3, 1989. The Watkins en banc court, however, did not reach the equal protection issue, instead deciding the case on estoppel grounds. Because the facts of this case do not support an estoppel argument, the Watkins opinion has little impact on this decision. We resubmitted this case and now address Pruitt's constitutional claims. We have jurisdiction over this appeal under 28 U.S.C. § 1291.
 
 STANDARD OF REVIEW
 
 11
 The district court's denial of Pruitt's motion for summary judgment and granting of the Army's motion to dismiss present questions of law which we review de novo. See Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986) (summary judgment); Mack v. South Bay Beer Distribs., Inc., 798 F.2d 1279, 1282 (9th Cir.1986) (dismissal).
 
 DISCUSSION
 I. First Amendment Claim
 
 12
 Pruitt characterizes her involuntary discharge as a violation of her rights to free speech guaranteed by the first amendment. She concedes that the Army legitimately may proscribe homosexual conduct in the military context. Nevertheless, because there is no allegation that she engaged in homosexual activity while on duty or performed inadequately as an officer, she contends that her discharge was based on protected expression--her public assertions of her sexuality recorded in the Los Angeles Times article.
 
 
 13
 Under the Army's regulation, a member may be discharged for stating that he or she is homosexual even absent proof of homosexual conduct, AR 135-175, p 2-39. Pruitt argues that this regulation is facially invalid because it inhibits pure speech, infringes on the right to receive information, and is not necessary to promote the military's interests. Alternatively, Pruitt argues that AR 135-175 is unconstitutional as applied in her case.
 
 
 14
 Because the allegations of the complaint establish that Pruitt was not discharged for her speech, a threshold requirement for implicating the first amendment, we reject these arguments. See Johnson v. Orr, 617 F.Supp. 170, 172, 174 (E.D.Cal.1985) (describing as "specious" a first amendment claim similar to that raised by Pruitt) aff'd mem., 787 F.2d 597 (9th Cir.1986). Pruitt argues that her statements about her sexual orientation constituted political speech, touching on a matter of public concern. It is true that the substance of the Los Angeles Times article was protected speech. Nevertheless, Pruitt was discharged not for the content of her speech, but for being a homosexual. Addressing this issue in a virtually identical case, the Seventh Circuit recently said:
 
 
 15
 [Appellant] is free under the regulation to say anything she pleases about homosexuality and about the Army's policy toward homosexuality. She is free to advocate that the Army change its stance; she is free to know and talk to homosexuals if she wishes. What [appellant] cannot do, and remain in the Army, is to declare herself to be a homosexual. Although that is, in some sense speech, it is also an act of identification. And it is the identity that makes her ineligible for military service, not the speaking of it aloud.
 
 
 16
 Ben-Shalom v. Marsh, 881 F.2d 454, 462 (7th Cir.1989) (emphasis in original), cert. denied, --- U.S. ----, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990).
 
 
 17
 This language applies equally well here. A central problem underlying Pruitt's first amendment argument is that it is based, understandably enough, on the classical dichotomy between the punishment of speech and the punishment of conduct. Because she was not discharged for her conduct, Pruitt concludes that she was discharged for her speech. The Army, however, is not discharging members just for homosexual conduct, or even primarily for homosexual conduct. It is discharging members because of their status as homosexuals. The pertinent portion of the regulation is entitled "Separation for Homosexuality." A homosexual is defined not only as a person who commits homosexual acts, but as one who "desires to engage" in them. AR 135-175, p 2-38a. An officer who engages in a homosexual act may be spared from separation if several facts are found, including the fact that "[s]uch conduct is a departure from the member's usual and customary behavior," and that "[t]he member does not desire to engage in or intend to engage in homosexual acts." Id. at p 2-39a(1), (5). In short, an officer who commits a homosexual act can remain in the service if he or she is not a homosexual, but must be separated if he or she is homosexual. See Watkins, 875 F.2d at 712-716 (concurring opinion) (Army's reenlistment ban based on homosexual orientation, not conduct).
 
 
 18
 The Army did not discharge Pruitt because she spoke candidly about her sexuality to a newspaper. Nor did it discharge her for publicly expressing her views on a timely and controversial subject, or for demonstrating compassion for and association with homosexuals. The Army discharged Pruitt because she admitted to being homosexual, and AR 135-175, §§ 2-39 through 2-44, require separation of homosexual officers from the armed forces. That it was her homosexuality, and not her speech, that caused Pruitt to be discharged is apparent from the subsection of the regulation under which she was discharged. It provides for separation of a member who "has stated that he/she is a homosexual or bisexual unless there is a further finding that the member is not a homosexual or bisexual. " AR 135-175, p 2-39b (emphasis added). Pruitt's admission, like most admissions, was made in speech, but that does not mean that the first amendment precludes the use of the admission as evidence of the facts admitted. See High Tech Gays v. Defense Indus. Security Clearance Office, 895 F.2d 563, 578-80 (9th Cir.1990). Pruitt admitted homosexuality and was discharged for it. The question is not whether the Army is free to discharge her for her speech, because it did not do so. The question is whether the Army is entitled to discharge her for her homosexuality--an issue not encompassed by Pruitt's first amendment claim.
 
 II. Equal Protection Claim
 
 19
 Although Pruitt's complaint contained general allegations that the regulation requiring her discharge was unconstitutional, she did not articulate an equal protection claim. Pruitt's complaint, however, and the entire action were dismissed under Fed.R.Civ.P. 12(b)(6), for failure to state a claim. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957) (footnote omitted). Even more to the point, "[a] party does not need to plead specific legal theories in the complaint, as long as the opposing party receives notice as to what is at issue in the lawsuit." Electrical Constr. & Maint. Co. v. Maeda Pacific Corp., 764 F.2d 619, 622 (9th Cir.1985); accord McCalden v. California Library Ass'n, 919 F.2d 538, 546 (9th Cir.1990). "The complaint should not be dismissed merely because plaintiff's allegations do not support the legal theory he intends to proceed on, since the court is under a duty to examine the complaint to determine if the allegations provide for relief on any possible theory." 5A C. Wright & A. Miller, Federal Practice and Procedure § 1357, at 336-37 (1990).
 
 
 20
 Pruitt's complaint included allegations that the Army was discharging her because of her status as a homosexual. She alleged, for example, that "the defendants do systematically remove homosexuals who are similarly situated to the plaintiff from the Armed Services of the United States and the United States Army on the basis of thoughts, speech and status." Complaint, p 21. These and the other facts pleaded by Pruitt are sufficient, in our view, to state an equal protection claim. At the minimum, they give notice that Pruitt could easily amend to state an equal protection claim--an opportunity she was not afforded.
 
 
 21
 Although the equal protection issue was not articulated in the complaint, it has been argued on appeal. The Army does not contend that Pruitt has failed to allege that she was discriminated against because of her homosexuality. Instead, the Army argues that its right to discharge homosexual servicepersons is so firmly supported in the law that any equal protection claim that Pruitt has asserted or might assert is legally insufficient on its face.
 
 
 22
 The Army first relies on Beller v. Middendorf, 632 F.2d 788 (9th Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405, 454 U.S. 855, 102 S.Ct. 304, 70 L.Ed.2d 150 (1981), in which we upheld the discharge from the Navy of three enlisted persons who had engaged in homosexual acts. In analyzing the Navy's actions under a due process standard, we held that there were several grounds on which the regulation could be upheld: "The Navy can act to protect the fabric of military life, to preserve the integrity of the recruiting process, to maintain the discipline of personnel in active service, and to insure the acceptance of men and women in the military, who are sometimes stationed in foreign countries with cultures different from our own." Id. at 811.
 
 
 23
 Beller, however, is distinguishable in three respects, and its holding is weakened in a fourth. First, the servicepersons in that case were discharged for homosexual conduct, not homosexual status. Pruitt does not dispute that the Army can discharge members for at least certain kinds of homosexual conduct, but she alleges that she was discharged for her status, with no evidence of conduct. Second, Beller was an appeal from several summary judgments. The Navy had submitted evidence to support the due process underpinnings of its regulation. Here the case was dismissed on motion; the Army has submitted no evidence justifying its regulation, and Pruitt has had no opportunity to dispute that evidence. Third, and most important, Beller was a substantive due process case. It did not deal with discrimination as such, or with the requisite level of justification for discrimination. That fact is significant in light of the later decision in City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), discussed below.
 
 
 24
 Finally, Beller 's reasoning, based significantly on prejudice of others against homosexuals, is undercut by the later decision in Palmore v. Sidoti, 466 U.S. 429, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). In Palmore, the Supreme Court struck down a denial of custody of a child based on social disapproval of the interracial marriage of her mother. In so ruling, the Court said: "The Constitution cannot control such prejudices but neither can it tolerate them. Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." Id. at 433, 104 S.Ct. at 1882. Cleburne made clear that this principle is not confined to instances of racial discrimination reviewed under strict scrutiny. Cleburne, 473 U.S. at 448, 105 S.Ct. at 3258. The justifications accepted in Beller, accordingly, should not be given unexamined effect today as a matter of law.[4]
 
 
 25
 The next case upon which the government principally relies is High Tech Gays v. Defense Indus. Security Clearance Office, 895 F.2d 563 (9th Cir.1990), upon which we requested and received supplemental briefing from the parties. In High Tech Gays, homosexual defense workers brought an equal protection challenge to the practice of the Department of Defense of routinely subjecting homosexuals to expanded investigations and adjudications prior to granting them security clearances. We rejected the contention that a classification of homosexuals was entitled to strict scrutiny, and instead required that the Department of Defense policy have a rational basis. Id. at 571-74. We then found that the Department's policy had a rational basis because foreign intelligence agencies had been shown to target homosexuals as potentially vulnerable to compromise. Id. at 576.
 
 
 26
 High Tech Gays will not, however, do the service the government asks of it. It is true that we found the discrimination against homosexuals in that case to have a rational basis, but it is clear that we applied the type of "active" rational basis review employed by the Supreme Court in City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). In Cleburne, the Supreme Court held that the City had failed to show a rational basis for its requirement that homes for the mentally retarded obtain a special permit, when other care and multiple-dwelling facilities needed no such permit. Relying on Palmore, the Court specifically rejected the legitimacy of relying on opposition to the home by neighbors. "[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently from apartment houses, multiple dwellings, and the like." Id. at 448, 105 S.Ct. at 3259. The Court observed that "this record does not clarify how, in this connection, the characteristics of the intended occupants of the Featherston home rationally justify denying to those occupants what would be permitted to groups occupying the same site for different purposes." Id. at 450, 105 S.Ct. at 3259.
 
 
 27
 In High Tech Gays, we relied on Cleburne and performed the same type of review to see whether the government had established on the record a rational basis for the challenged discrimination.[5] The government submitted, and we reviewed declarations of officials that explained the practice of foreign intelligence agencies (notably the KGB) to target homosexuals. High Tech Gays, 895 F.2d at 576-77. The declarations referred to and incorporated expert testimony to the same effect. Id. Finally, we rejected as insufficient the plaintiffs' affidavits attempting to establish that the KGB's policy of targeting homosexuals was irrational; we ruled that the Department was entitled to take the KGB's practices into account even if they were irrational. Id. at 578.
 
 
 28
 It is clear, then, that in High Tech Gays, upon plaintiffs' showing of discrimination, we required the government to establish on the record that its policy had a rational basis. The Supreme Court imposed the same requirement in Cleburne. Neither case supports the contention of the Army here that its far more rigid discrimination against homosexuals should be held to be rational as a matter of law, without any justification in the record at all. We have before us only a complaint that has been dismissed for failure to state a claim. After Palmore, Cleburne and High Tech Gays, we cannot say that the complaint is insufficient on its face. Assuming that Pruitt supports her allegations with evidence, we will not spare the Army the task, which those cases imposed, of offering a rational basis for its regulation, nor will we deprive Pruitt of the opportunity to contest that basis.
 
 III. Deference to the Military
 
 29
 Finally, the Army urges that we should defer to the military judgment. We readily acknowledge, as we must, that military decisions by the Army are not lightly to be overruled by the judiciary. See, e.g., Rostker v. Goldberg, 453 U.S. 57, 64-68, 101 S.Ct. 2646, 2651-2654, 69 L.Ed.2d 478 (1981); Goldman v. Weinberger, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). That admonition, however, is best applied in the process of judging whether the reasons put forth on the record for the Army's discrimination against Pruitt are rationally related to any of the Army's permissible goals. We have no doubt that the district court will remain aware of the proper respective roles of the military and the judiciary in entertaining further proceedings in this case.
 
 
 30
 If we now deferred, on this appeal, to the military judgment by affirming the dismissal of the action in the absence of any supporting factual record, we would come close to denying reviewability at all. While we have acknowledged that there are some internal military matters that are totally exempt from judicial review, we have also identified many that are reviewable. See Wallace v. Chappell, 661 F.2d 729, 733 n. 4 (9th Cir.1981), rev'd on other grounds, 462 U.S. 296, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983). In Wallace, we adopted the test of Mindes v. Seaman, 453 F.2d 197 (5th Cir.1971),[6] to determine the reviewability of military decisions. The Army does not argue--and the district court did not hold--that the Mindes test precludes review here. Indeed, the validity of a regulation similar to the one before us was reviewed in Beller. The Army does not ask us to deny review; it asks us to uphold its regulation without a record to support its rational basis. This we decline to do.
 
 IV. Conclusion
 
 31
 Pruitt failed to state a first amendment claim; the district court did not err in denying her motion for summary judgment. The district court erred, however, in dismissing Pruitt's action on the ground that her complaint failed to state a claim for relief. Her complaint alleges facts sufficient to state an equal protection claim. We reverse the judgment of dismissal, and remand for further appropriate proceedings, including those directed toward determining whether the Army's discrimination is rationally related to a permissible governmental purpose.
 
 
 32
 Pruitt is entitled to her costs on this appeal.
 
 
 33
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
 
 
 
 *
 Richard Cheney has been substituted for Casper Weinberger, Fed.R.App.P. 43(c)
 
 
 **
 Michael P.W. Stone has been substituted for John O. Marsh, Jr., Fed.R.App.P. 43(c)
 
 
 [1]
 Pruitt also alleged that her discharge violated Fifth Amendment due process because the Army was violating its own regulations. Pruitt no longer pursues this claim
 
 
 [2]
 "Homosexual means a person, regardless of sex, who engages in, desires to engage in, or intends to engage in homosexual acts." AR 135-175, § VII, p 2-38(a)
 
 
 [3]
 The Army's criteria for determining when a servicemember will be separated for homosexuality are set forth in AR 135-175, which provides:
 2-39 Criteria. The basis for separation may include preservice, prior service, or current service conduct or statements. A member shall be separated under the provisions of this section if one or more of the following approved findings is made:
 a. The member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts unless there are approved further findings that:
 (1) Such conduct is a departure from the member's usual and customary behavior.
 (2) Such conduct under all circumstances is unlikely to recur because it was solely the result of immaturity, intoxication, coercion, or a desire to avoid military service.
 (3) Such conduct was not accomplished by use of force, coercion, or intimidation by the member during a period of military service.
 (4) Under the particular circumstances of the case, the member's continued presence in the service as an officer of the Army is consistent with the interest of the Army in proper discipline, good order, and morale; and
 (5) the member does not desire to engage in or intend to engage in homosexual acts.
 b. The member has stated that he/she is a homosexual or bisexual unless there is a further finding that the member is not a homosexual or bisexual.
 c. The member has married or attempted to marry a person known to be of the same biological sex (as evidenced by the external anatomy of the persons involved) unless there are further findings that the member is not a homosexual or bisexual (e.g., where the purpose of the marriage or attempt to marry was the avoidance or termination of military service).
 
 
 [4]
 Similar weaknesses inhere in Hatheway v. Secretary of the Army, 641 F.2d 1376 (9th Cir.), cert. denied, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981). Hatheway was a case based on conduct alone; Hatheway attacked his court-martial conviction for sodomy on the ground that homosexual sodomy was prosecuted while heterosexual sodomy was not. In rejecting the equal protection argument, Hatheway relied on the same justifications accepted in Beller, including those arising from prejudice of other servicemembers or potential recruits against homosexuals. Hatheway, like Beller, preceded the Supreme Court's decisions in Palmore and Cleburne
 Much the same may be said of other cases cited by the Army that rely on Beller to support the rationality of blanket discrimination by the armed forces against homosexuals. See Dronenburg v. Zech, 741 F.2d 1388 (D.C.Cir.1984); Rich v. Secretary of the Army, 735 F.2d 1220 (10th Cir.1984). These cases involved homosexual conduct, and essentially adopted Beller in finding the discrimination justified. Beller was also followed in Woodward v. United States, 871 F.2d 1068 (Fed.Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); although it was decided after Palmore and Cleburne, Woodward did not consider the possible effect of those cases on Beller's analysis.
 
 
 [5]
 It should be noted that in High Tech Gays, we engaged in active rational basis review despite our conclusion that Bowers v. Hardwick, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), militated against a higher level of scrutiny. High Tech Gays, 895 F.2d at 573 n. 9. Hardwick had ruled that homosexuals could not rely on a right of privacy to exempt them from criminal laws proscribing sodomy. In relying partly on Hardwick to negate a higher standard of equal protection review, we noted that Hardwick, like High Tech Gays, was a case relating to conduct, not orientation. Id. Hardwick is therefore even less of a barrier to active rational basis review in this case than it was in High Tech Gays
 
 
 [6]
 Mindes established two threshold requirements for review: the plaintiff must (1) allege a violation of the Constitution, a federal statute, or military regulations and (2) exhaust intraservice remedies. If those requirements are met, reviewability depends on a weighing of four factors: (1) the nature and strength of the plaintiff's claim; (2) the potential injury to plaintiff if review is refused; (3) the extent of interference with military functions; (4) the extent to which military discretion or expertise is involved. Mindes, 453 F.2d at 201-02