**Lt. Paul G. THOMASSON,**
**USN, Plaintiff,**

v.

**The Honorable William J. PERRY,**
**Secretary of Defense,**

**and**

**The Honorable John H. Dalton, Secretary**
**of the Navy, Defendants.**

Civ. A. No. 95–252–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

June 8, 1995.

ert P. Monahan, LCDR Edward S. White Department of Navy, Office of Judge Advocate General, Alexandria, VA, for defendants.

## MEMORANDUM OPINION

HILTON, District Judge.

This matter came before the Court on cross-motions for summary judgment. Plaintiff Lt. Paul G. Thomasson brings this action seeking permanent injunctive and declaratory relief to prevent the Defendants from discharging or otherwise removing him from active duty in the United States Navy as a result of his statement that he is a homosexual. The Plaintiff maintains that the National Defense Authorization Act for the Fiscal Year 1994, 10 U.S.C. § 654, known colloquially as the "Don't Ask Don't Tell" policy, is unconstitutional on its face and as applied to the Plaintiff in this action. Lt. Thomasson challenges the statute under the First Amendment, the Equal Protection Clause of the Fifth Amendment, the Due Process Clause of the Fifth Amendment, and the Administrative Procedure Act. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346. Venue lies under 28 U.S.C. § 1391.

## BACKGROUND OF THE ACT

On January 29, 1993, President Clinton directed then Secretary of Defense Les Aspin to re-evaluate the Department of Defense's ("DOD's") longstanding policy excluding homosexuals from service in the armed forces. From March through late July, 1993, the Armed Services Committees of the House and Senate held extensive public hearings on the matter. The Committees received testimony from military commanders, gay rights activists, experts in military personnel policy, professors, social scientists, interested civilians and members of the armed forces, and conducted a field visit to Norfolk Naval Complex.[1] On July 19, 1993, the Pres-

Mark Lynch, Allan B. Moore, Georgia Kazakis, Robert D. Wick, Covington & Burling, Washington, DC, for plaintiff.

Helen Fahey, United States Attorney, Jeri K. Somers, Assistant United States Attorney, Alexandria, VA, Frank W. Hunger, Assistant Attorney General, John A. Rogovin, Deputy Assistant Attorney General, Washington, DC, David Anderson, Vincent M. Garvey, Michael J. Haungs, Civil Division, Department of Justice, Washington, DC, CDR Rob-

1. The Senate held hearings on March 29, and 31, on April 29, on May 7, 10, 11 and on July 20–22, 1993. *See Policy Concerning Homosexuality in the Armed Forces: Hearings Before the Senate Comm. on Armed Services*, 103d Cong., 2d Sess. (1993). The House held hearings on May 4 and 5 and on July 21–23, 1993. *See Policy Implications of Lifting the Ban on Homosexuals in the Military: Hearings Before the House Comm. on Armed Services*, 103d Cong., 1st Sess. (1993);

ident announced a new "Policy on Homosexual Conduct in the Armed Forces," which was subsequently enacted in the National Defense Authorization Act for Fiscal Year 1994, Pub.L. No. 103–160, § 571, 107 Stat. 1670–73, *codified at* 10 U.S.C. § 654 (1995). The Act was signed by the President on November 30, 1993. On December 22, 1993, DOD issued implementing Directives, modified slightly on February 28, 1994, and made effective on that date. On the same date, each of the DOD military services issued service-specific instructions to the field implementing the DOD Directives.

Section 571 of the Act sets forth the "Policy concerning homosexuality in the armed forces," which reflects Congress' policy determination made on the basis of the testimony and information garnered from the hearings. This Section contains fifteen findings which recognize, among other things, "military life is fundamentally different from civilian life," and, therefore, its "society includes numerous restrictions on personal behavior that would not be acceptable in civilian society." 10 U.S.C. § 654(a)(8)(B)(1995). Congress also noted that "[s]uccess in combat requires military units that are characterized by high morale, good order and discipline, and unit cohesion." *Id.* The Act concludes that the longstanding exclusion from service in the military of persons who engage in, or demonstrate a propensity to engage in, homosexual conduct continues to be necessary because the presence of such service members "would create an unacceptable risk" to these fundamental components of military capability. *Id.* § 654(a)(15).

Accordingly, the statute provides for mandatory separation from the military if one or more of the following three findings is made:

(1) the member is found to have engaged, attempted to engage, or solicited another to engage, in homosexual acts; (2) "stated that he or she is a homosexual or bisexual ... unless [the member] has demonstrated that he or she is not a person who engages in,

attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts," *id.* § 654(b)(2); or (3) "married or attempted to marry a person known to be of the same biological sex." *Id.* § 654(b)(3). As the language of Section 654(b)(2) indicates, and the legislative history confirms, a member's statement that he or she is a homosexual gives rise to a rebuttable presumption that the member engages in, or is likely to engage in, homosexual acts. S.Rep. No. 112, 103d Cong., 1st Sess., at 293–94 (1993), U.S.Code Cong. & Admin.News 1993 at pp. 2080–81.

The implementing Directive applicable to military officers, such as Plaintiff, is DOD Directive 1332.30, captioned "Separation of Regular Commissioned Officers," which the Navy has implemented.[2] This Directive provides that the military will not ask about an applicant's sexual orientation because homosexual *orientation* "is considered a personal and private matter and is not a bar to continued service ... unless manifested by homosexual conduct." DOD Dir. 1332.30, Encl. 2, ¶ C, at 2–1 (March 4, 1994). The Directive defines "Homosexual Conduct" as including "homosexual acts, a statement by a member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage." *Id.* Under the Directive, "[p]ropensity to engage in homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts." *Id.* Although a statement may demonstrate a propensity or intent to engage in homosexual conduct, the Directive provides the service member with an opportunity "to rebut the presumption by presenting evidence demonstrating that he or she does not engage in, attempt to engage in, have a propensity to engage in or intend to engage in homosexual acts." *Id.* ¶ C.1.b., at 2–2.

The Directive provides explicit guidance to administrative boards when assessing whether an officer has rebutted the presumption.

---

*Assessment of the Plan to Lift the Ban on Homosexuals in the Military: Hearings Before the Military Forces and Personnel Subcomm. of the House Comm. on Armed Services,* 103d Cong., 1st Sess. (1993).

**2.** CNO message 01300Z MAR 94 (NAVADMIN 033/94). *See* 11 Rec. GE10, at 272.

The Directive instructs the boards to consider, among other things,

> (1) Whether the officer has engaged in homosexual acts; (2) The officer's credibility; (3) Testimony from others about the officer's past conduct, character, and credibility; (4) The nature and circumstances of the officer's statement; and (5) Any other evidence relevant to whether the officer is likely to engage in homosexual acts.

*Id.* ¶ C.1.b.(1)–(5), at 2–2; *see* 10 U.S.C. § 654(b)(1)(A)–(E).

As the Senate Committee found, the new policy is essentially the same as the pre–1994 policy in that it provides for mandatory separation from the military on the basis of homosexual acts, marriages, or statements indicating a propensity to engage in homosexual conduct. The primary difference is that the DOD will not ask questions about sexual orientation as part of accession processing. The new policy also provides guidance on the conduct of investigations. S.Rep. No. 112, at 289–90, U.S.Code Cong. & Admin.News, at 2076–77.

On March 2, 1994, the day after the Navy implemented the DOD Directives with regard to service by homosexuals, Lt. Thomasson delivered a letter to four Navy admirals for whom he had served at the Bureau of Naval Personnel stating that he was a homosexual. Lt. Thomasson indicated in his letter that this characteristic was "more deeply rooted than all societal, religious, parental, or peer pressures can effect [sic]." I Rec.Tr., at 4–5. In accordance with military policy, the Navy instituted separation proceedings.

An administrative Board of Inquiry was convened at which Plaintiff was represented by military counsel as well as his current civilian counsel. The Board heard two days of testimony and argument and received into evidence several volumes of materials relating both to Lt. Thomasson's record and the Navy's policy on homosexuality. Lt. Thomasson submitted evidence of his service record, expert testimony regarding the meaning and nature of both homosexuality and the military's policy on homosexuality, and written and live testimony from 15 witnesses with whom he had served and worked over the course of his career. The Navy did not introduce any rebuttal evidence or dispute the substance of any of Lt. Thomasson's evidence. Indeed, during its phase of the proceedings, the Navy acknowledged that Lt. Thomasson had attained an "enviable" service record. I.Rec.Tr. at 0036, 0148. The Navy also acknowledged that there was no evidence that Lt. Thomasson had engaged in any "homosexual acts." Plaintiff refused, however, to introduce evidence to rebut the presumption that he engages in or has a propensity to engage in homosexual acts by reading an unsworn statement to the Board, stating: "I will not go further in degrading myself by disproving a charge about sexual conduct that no one has made." I Rec.Tr., at 141, IV Rec. T2A.

After hearing all of the evidence, the Board of Inquiry unanimously voted that Lt. Thomasson had made statements that indicated he "engages in, attempts to engage in, or has a propensity or intent to engage in homosexual acts" as prohibited by the policy and that he had not rebutted the presumption raised by those statements, thereby failing to show cause for retention. The Board accordingly recommended that Lt. Thomasson be honorably discharged.

On September 9, 1994, a three-member Board of Review convened to examine Lt. Thomasson's case. The Board of Review, without comment, unanimously upheld the Board of Inquiry's finding that Lt. Thomasson had failed to establish that he should be retained on active duty, and recommended that he be separated with an honorable discharge. The Assistant Secretary of the Navy for Manpower and Reserve Affairs approved the discharge on January 17, 1994. Lt. Thomasson's honorable discharge certificate has been signed but it has not yet been dated or delivered. On February 27, 1995, Lt. Thomasson filed suit in this Court, seeking declaratory and injunctive relief to prevent his discharge. This Court granted a preliminary injunction enjoining the Navy from any further action pending resolution of this case.

Summary judgment must be entered when "there is no genuine issue as to any material fact" and therefore "the moving party is enti-

tled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A fact is material when proof of its existence or non-existence would affect the outcome of the case, and an issue is genuine if a reasonable jury might return a verdict in favor of the non-moving party on the basis of such issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Both parties in the instant action agree that the facts in this case are not in dispute. This action, therefore, is ripe for summary judgment.

### THE FIRST AMENDMENT

■ Lt. Thomasson contends that the policy at issue violates his rights of freedom of speech and association as guaranteed him by the First Amendment, both on its face and as applied to him in particular. The Plaintiff argues that the policy infringes on the First Amendment because it is a content-based restriction on speech. By making certain statements in and of themselves a sufficient ground for discharge, he contends that the policy is directly aimed at the suppression of free expression—statements that a service member is gay—rather than at any conduct that the military might legitimately regulate.

The Plaintiff, however, misses the fundamental point that the policy uses the speech as evidence, via rebuttable presumption, that the service member's declaration of his homosexuality will lead to homosexual conduct. In the instant matter, the Navy did not, as Plaintiff claims, argue at Lt. Thomasson's discharge hearing that the Board should recommend discharge solely "because Lt. Thomasson's verbal acknowledgement of his sexual orientation was—in and of itself—forbidden 'homosexual conduct.'" Pl's Mem. of P.A. in Supp. of Mot. for Sum.J. at 43. Rather, the Navy argued that Plaintiff's statement gave rise to a presumption that he engages in, or has a propensity or intent to engage in, homosexual acts.

The Supreme Court has recently held in the criminal context that "[t]he First Amendment ... does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, — U.S. —, —, 113 S.Ct.

2194, 2201, 124 L.Ed.2d 436 (1993). *See also Dawson v. Delaware*, 503 U.S. 159, 164, 112 S.Ct. 1093, 1097, 117 L.Ed.2d 309 (1992) ("[T]he Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment."). If this holds true in the criminal context, it is certainly applicable in the civil context, where the litigant is not afforded the same constitutional protections as is a criminal defendant. And certainly nothing in the First Amendment bars the use of a statement constituting an admission. *See Pruitt v. Cheney*, 963 F.2d 1160, 1164 (9th Cir.1991) (an "admission [of homosexuality], like most admissions, was made in speech, but that does not mean that the first amendment precludes the use of the admission as evidence of the facts admitted"), *cert. denied*, — U.S. —, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992) (*citing High Tech Gays v. Defense Indus. Security Clearance Office*, 895 F.2d 563, 578–80 (9th Cir.1990)). Although the DOD regulation does affect speech, as the Seventh Circuit recognized, "it does so only incidentally, in the course of pursuing other legitimate goals." *Ben–Shalom v. Marsh*, 881 F.2d 454, 462 (7th Cir. 1989). Indeed, every court of appeals to address this issue under the military's former policy, which contained the same rebuttable presumption, concluded that the use of a statement in this circumstance did not violate the First Amendment. *Pruitt*, 963 F.2d at 1163–64; *Schowengerdt v. United States*, 944 F.2d 483, 489 (9th Cir.1991); *Ben–Shalom*, 881 F.2d at 458–62; *Rich v. Secretary of the Army*, 735 F.2d 1220, 1228–29 (10th Cir. 1984).

The Plaintiff attempts to distinguish this policy from the pre–1994 policy by arguing that unlike the prior policy, the present policy now means that only homosexuals who speak about their sexual orientation are presumptively unfit for military service. The Plaintiff argues that the policy now concedes that "there is nothing impermissible about being gay and that [because] homosexuals may continue to serve [in the military,] the acknowledgement that one is gay has no

conceivable evidentiary value." Pl's Opp. to Def's Mot. for Summ.J. at 34. Again, however, the Plaintiff misreads the policy. Service members who engage in, or demonstrate a propensity to engage in, homosexual conduct are unfit for service under the policy. Statements made by those acknowledging their homosexuality are taken as evidence that the person has, or will in the future, engage in prohibited conduct. But statements are not the only means for discharge. Those that don't speak about their sexual orientation may still be discharged if it is discovered that they engage in or have a propensity to engage in prohibited conduct. The statute, therefore, does not punish only those homosexuals who speak about their sexual preference.

Lt. Thomasson further argues that the policy implicates the First Amendment and is "particularly pernicious" because it penalizes an individual's honest statements about his personal identity and his affiliation with a particular group. The Court has indicated that a service member's expressive rights must often yield to the necessities of military life. *See, e.g., Goldman v. Weinberger,* 475 U.S. 503, 508, 106 S.Ct. 1310, 1313–14, 89 L.Ed.2d 478 (1986) (upholding regulations precluding Orthodox Jew and ordained rabbi from wearing yarmulke while in military uniform); *Greer v. Spock,* 424 U.S. 828, 838, 96 S.Ct. 1211, 1217–18, 47 L.Ed.2d 505 (1976) (upholding restrictions of political speech on military base). As the Supreme Court has recognized, the judiciary's "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman,* 475 U.S. at 507, 106 S.Ct. at 1313. *See also Brown v. Glines,* 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980) ("Thus, while members of the military services are entitled to the protections of the First Amendment, 'the different character of the military community and of the military mission requires a different application of those protections.'") (*quoting Parker v. Levy,* 417 U.S. 733, 759, 94 S.Ct. 2547, 2563, 41 L.Ed.2d 439 (1974)).

In this instance, however, Lt. Thomasson was not discharged from the Navy because of his stated or symbolic expression of an opinion opposing the policy, or because of his support for a group that opposes the policy. Instead, he was discharged for stating that he was a homosexual and refusing to rebut the presumption that he would thereby engage in homosexual conduct—conduct which the military may validly proscribe. Under the policy, a service member is free to affiliate with a group that opposes the policy, to make statements criticizing the policy, to attend demonstrations in favor of homosexual rights, to read homosexual newspapers, or engage in other such expressive activities. *See* DOD Dir. 1332.30, Enc. 8 ¶ C.3.d., at 8–2; S.Rep. No. 112, at 292, U.S.Code Cong. & Admin.News, at 2079. What the service member is not free to do is declare himself to be a homosexual and fail to rebut the entirely reasonable presumption that as a homosexual he will engage in homosexual conduct. *See Ben–Shalom,* 881 F.2d at 464 (holding that a service member's statement indicating a likelihood of homosexual acts "can be rationally and reasonably viewed as reliable evidence" that the service member engages in or is likely to engage in homosexual acts). Thus, the basis for separation is acts and the likelihood of acts, not "speech." *See Pruitt,* 963 F.2d at 1160 (holding that pre–1994 policy does not implicate First Amendment).

It is for these reasons that the policy likewise does not infringe on Lt. Thomasson's right to freedom of association as guaranteed by the First Amendment. The policy is *not* directed, as Plaintiff claims, toward statements of "personal identity," or "affiliation with a particular group," or "a firmly held affiliation with homosexuality." Service members, whatever their sexual orientation, are free to identify themselves as sympathetic to gay rights causes, criticize the policy, and advocate change. Indeed, the policy *expressly* provides that participation in such associational activities in and of itself is not a sufficient basis for discharge. DOD Dir. 1332.30, Encl. 8, ¶ C.3.d, at 8–2. For these reasons, the Court finds that the instant policy does not infringe on the protections afforded Lt. Thomasson under the First Amendment.

## EQUAL PROTECTION

█ Lt. Thomasson argues that both on its face, and as applied to him in particular, the Defendants' policy regarding service by homosexuals in the military violates the equal protection guarantee of the Fifth Amendment in three ways: (1) by discriminating against homosexuals on the basis of their status as homosexuals; (2) by discriminating against acknowledged (or "open") homosexuals on the basis of their status as open homosexuals and their statements about their status; and (3) by illegitimately and irrationally presuming that open homosexuals, by definition, will violate military codes of conduct.

The Equal Protection Clause of the Fourteenth Amendment directs that no state shall "deny to any person within its jurisdiction the equal protection of the laws." It is made binding on the federal government by the Due Process Clause of the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 498–99, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Fifth Amendment equal protection claims are treated precisely the same as equal protection claims under the Fourteenth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n. 2, 95 S.Ct. 1225, 1228, n. 2, 43 L.Ed.2d 514 (1975).

In evaluating the Plaintiff's equal protection claim, the Court must first determine which of the three recognized levels of equal protection review to employ: rational review, intermediate scrutiny, or strict scrutiny. *See Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440–41, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985) (describing various standards of review). At the outset, it is important to recognize the particularly limited role of the judiciary in reviewing policies implemented by Congress in the military arena. Article I, Section 8 of the Constitution provides Congress with exclusive power to raise and support armies. As the Supreme Court has recognized, "judges are not given the task of running the Army, ... [t]he military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters...." *Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953).

The issue of what standard of review to apply to equal protection challenges to the military's policy governing service by homosexuals has been addressed previously by five federal courts of appeals. Each court has held that rational basis is the proper standard, whether the challenge involved exclusion because of homosexual acts or based on statements. *See Steffan v. Perry*, 41 F.3d 677, 684 (D.C.Cir.1994) (*en banc*); *Meinhold v. Department of Defense*, 34 F.3d 1469, 1478 (9th Cir.1994); *Ben–Shalom*, 881 F.2d at 464; *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed.Cir.1989), *cert. denied*, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); *Rich v. Secretary of the Army*, 735 F.2d 1220, 1229 (10th Cir.1984); *accord High Tech Gays*, 895 F.2d at 574 (applying rational basis test to challenge by civilian homosexual applicants to Department of Defense security clearance policy). *See also Walmer v. United States DOD*, 52 F.3d 851 (10th Cir.1995) (reaffirming validity of rational basis review in evaluating equal protection challenges to the military's policy regarding service by homosexuals as previously articulated in *Rich*).

The Plaintiff contends, however, that his claim is subject to review under strict scrutiny[3] because the Defendants' policy creates a suspect classification by disadvantaging homosexuals solely on the basis of their sexual orientation and because the policy infringes on the Plaintiff's fundamental right of free speech. As discussed above, the policy does not violate Lt. Thomasson's rights under the First Amendment so application of strict scrutiny on that basis is not appropriate.

---

**3.** In the alternative, Lt. Thomasson maintains that the policy is at least subject to intermediate scrutiny because sexual orientation is a phenomenon that is somehow legally akin to gender. Intermediate scrutiny, however, has only been applied to cases involving classifications *based on* gender, *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 723–24, 102 S.Ct. 3331, 3335–36, 73 L.Ed.2d 1090 (1982), and illegitimacy, *Lalli v. Lalli*, 439 U.S. 259, 265, 99 S.Ct. 518, 523, 58 L.Ed.2d 503 (1978). This Court is unwilling to expand the law in that regard based on an oblique theory linking gender and sexual orientation.

The Plaintiff in this action correctly maintains that, while courts must accord deference to the policy determinations made by Congress in the arena of military affairs, there is no "military exception" to the Constitution. Indeed, as Lt. Thomasson points out, "a different equal protection test" does not apply simply because a case arises in the military context. *Rostker v. Goldberg,* 453 U.S. 57, 71, 101 S.Ct. 2646, 2655, 69 L.Ed.2d 478 (1981). As the Plaintiff acknowledges, however, homosexuals have not been characterized as a "suspect class," which would require the Court to analyze any classification under strict scrutiny.

The Plaintiff argues that this Court should extend the class to include homosexuals because homosexuals constitute a "discrete and insular minorit[y]" under the test articulated by the Supreme Court in *United States v. Carolene Prods. Co.,* 304 U.S. 144, 152–53, n. 4, 58 S.Ct. 778, 783–84, n. 4, 82 L.Ed. 1234 (1938). Because the government is free to criminalize homosexual conduct, however, "a group that is defined by reference to that conduct cannot constitute a 'suspect class.'" *Steffan,* 41 F.3d at 684. *See also Ben–Shalom,* 881 F.2d at 464. Further, the Supreme Court has expressed great "reluctan[ce]" to expand the number of classifications afforded heightened scrutiny. *Cleburne,* 473 U.S. at 441, 105 S.Ct. at 3255. The Court has refused to accord heightened scrutiny to the elderly, *Massachusetts Bd. of Retirement v. Murgia,* 427 U.S. 307, 313, 96 S.Ct. 2562, 2566–67, 49 L.Ed.2d 520 (1976); the mentally retarded, *Cleburne,* 473 U.S. at 442, 105 S.Ct. at 3255–56; "close relatives," *Lyng v. Castillo,* 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986); and a statutorily-defined "family unit," *Bowen v. Gilliard,* 483 U.S. 587, 601–03, 107 S.Ct. 3008, 3017–18, 97 L.Ed.2d 485 (1987). Therefore, because homosexuals do not constitute a suspect class and the policy does not infringe on the exercise of a fundamental right, analysis of the regulations at issue under strict scrutiny is not appropriate.

█ The Plaintiff's challenge of the regulations based on the Equal Protection Clause must be examined under the standard of rational review. When evaluating a statute or regulation under rational-basis review, the court must ask two questions: First, are the regulations directed at the achievement of a legitimate governmental purpose and, second, do they rationally further that purpose? *Trimble v. Gordon,* 430 U.S. 762, 766, 97 S.Ct. 1459, 1463, 52 L.Ed.2d 31 (1977); *Heller v. Doe,* —— U.S. ——, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller,* —— U.S. at ——, 113 S.Ct. at 2642. Under this standard of review, the government "has no obligation to produce evidence to sustain the rationality of a [regulatory] classification." *Id.* at ——, 113 S.Ct. at 2643. Because "a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity," *id.,* at ——, 113 S.Ct. at 2642, "'[t]he burden is on the one attacking the [governmental] arrangement to negative every conceivable basis which might support it,' whether or not the basis has a foundation in the record." *Id.* at ——, 113 S.Ct. at 2643 (*quoting Lehnhausen v. Lake Shore Auto Parts Co.,* 410 U.S. 356, 364, 93 S.Ct. 1001, 1006, 35 L.Ed.2d 351 (1973)).

Moreover, the Plaintiff in an action challenging the validity of a military regulation has an even greater burden to overcome given the deference courts must accord to action by the political branches in the military context. The Supreme Court has recognized that "[t]he constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping." *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Because the military is, "by necessity, a specialized society separate from civilian society," *Parker v. Levy,* 417 U.S. 733, 743, 94 S.Ct. 2547, 2555, 41 L.Ed.2d 439 (1974), the Supreme Court has held that "Congress is permitted to legislate both with greater breadth and with greater flexibility when prescribing the rules by which [military society] shall be governed...." *Id.* at 743, 756, 94 S.Ct. at 2555–56, 2561–62. Indeed, "perhaps in no other area has the Court accorded Congress great-

er deference" than in the military context. *Rostker*, 453 U.S. at 61, 64–65, 101 S.Ct. at 2649–50, 2651–2652 (1981).

In addition, the Supreme Court has noted the lack of competence on the part of courts to second-guess decisions made by Congress in the military context. In *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) the Court emphatically declared:

> [I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle and professional decisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.

*Id.* at 10, 93 S.Ct. at 2446. The Court has recognized that "'the military must insist upon a respect for duty and a discipline without counterpart in civilian life'" to "foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman*, 475 U.S. at 507, 106 S.Ct. at 1313 (*quoting Schlesinger v. Councilman*, 420 U.S. 738, 757, 95 S.Ct. 1300, 1312–13, 43 L.Ed.2d 591 (1975)). *See also* 10 U.S.C. § 654(a)(8) (1995). Restrictions promulgated to achieve these goals are matters entrusted to the military's "considered professional judgment," *Goldman*, 475 U.S. at 508, 106 S.Ct. at 1313, and courts have traditionally recognized that "judicial deference is at its apogee when legislative action under the congressional authority to raise and support armies and make rules and regulations for their governance is challenged." *Rostker*, 453 U.S. at 70, 101 S.Ct. at 2654–55.

These principles are particularly pertinent in this matter. Like the regulation at issue in *Rostker v. Goldberg*, where the Court upheld a military regulation requiring the registration of males and not females in the face of an equal protection challenge, this regulation "was extensively considered by Congress in hearings, floor debate, and in committee." 453 U.S. at 72, 101 S.Ct. at 2655. Accordingly, the Supreme Court has cautioned that in making a determination on the merits in this circumstance, a court "must be particularly careful not to substitute [its] judgment of what is desirable for that of Congress, or

[its] own evaluation of evidence for a reasonable evaluation by the Legislative Branch." *id.* at 68, 101 S.Ct. at 2653, especially when "Congress specifically considered the question of the Act's constitutionality." *Id.* at 64, 101 S.Ct. at 2651. *See* S.Rep. No. 112, at 284–87 U.S.Code Cong. & Admin.News at 2070–72 (addressing impact of policy on constitutional rights of homosexual service members).

■ In promulgating the "Don't Ask Don't Tell" policy, the government has clearly articulated a legitimate purpose for excluding persons who engage in or who demonstrate a propensity to engage in homosexual conduct. The military has concluded that allowing acknowledged homosexuals to serve in the military would undermine unit cohesion and military readiness. Congress heard testimony from top military professionals that unit cohesion is the single most important factor in maintaining an effective militia. General Colin Powell, then Chairman of the Joint Chiefs of Staff, testified that "[t]o win wars, we create cohesive teams of warriors who will bond so tightly that they are prepared to go into battle and give their lives if necessary for the accomplishment of the mission and for the cohesion of the group and for their individual buddies." S.Rep. No. 112, at 275, U.S.Code Cong. & Admin.News, at 2061. *See also id.* at 276, U.S.Code Cong. & Admin.News at 2062 (quoting testimony of Dr. William Daryl Henderson, former Commander of the Army Research Institute and author of *Cohesion: The Human Element in Combat* regarding importance of unit cohesion to success in combat). Military professionals testified that unit cohesion must be developed long before the unit is sent to the battlefield or the unit simply will not perform effectively. *See id.* at 275–76, U.S.Code Cong. & Admin.News at 2061–62 (citing testimony of Dr. David Marlowe, Chief of the Department of Military Psychology at the Walter Reed Army Institute of Research and General Colin Powell).

The first reason cited by the government that the presence of homosexuals in the military undermines unit cohesion focuses on privacy concerns of service members who are required to live in conditions "characterized

by forced intimacy with little or no privacy." 10 U.S.C. § 654(a)(12) (1995). The Senate Committee noted the testimony of several witnesses who stated that permitting persons who engage in, or will likely engage in, homosexual conduct to serve in the military would infringe on the privacy concerns of other service members. Concern for the privacy of service members is clearly legitimate as evidenced by the fact that the military places men and women in different living quarters. As the Senate Armed Forces Committee concluded, "[i]n civilian life, people are not compelled to live with individuals who are sexually attracted to persons of the same sex, and the committee finds no military necessity to compel persons to do so in the military." S.Rep. No. 112, at 281, U.S.Code Cong. & Admin.News, at 2067–68.

Closely related to the military's concern for the privacy of its service members is the concern over introduction of sexual tension into units. The military has determined that sexual tension jeopardizes military readiness. Again, because sexual behavior is a powerful force, the military has provided separate living quarters and assignment policies based on gender. Just as it is reasonable for the military to take sexual behavior and sexual tension into account in establishing gender-based assignment policies, the Senate Committee found it was reasonable for the military to take these considerations into account "when addressing issues concerning persons who engage in or have the propensity or intent to engage in sexual activity with persons of the same sex." *Id.* at 278, U.S.Code Cong. & Admin.News at 2064.

The Plaintiff asserts in Counts II and III that the true purpose of the policy is to exclude homosexuals from the military because of their status as homosexuals, not because of their conduct. The Plaintiff argues that the government's policy is based on irrational and invidious prejudice and stereotypes and has no empirical basis. Lt. Thomasson maintains, and indeed the government concedes, that his service record is outstanding. He argues that his sexual orientation is of no consequence to his performance and has no impact on unit cohesion. The policy, however, is not based on prejudice but on the military's need to address the legitimate concern that service by homosexuals in the military will adversely impact unit cohesion and military readiness. The Committee noted that these restrictions reflect "professional military judgment as to what categories of personnel contribute to overall combat effectiveness rather than narrow performance criteria related to the performance of a specific task." S.Rep. 112 at 273, U.S.Code Cong. & Admin.News at 2061.

While it is true that some service members may view themselves as homosexuals but nonetheless remain celibate, it would not be rational to develop military personnel policies on the basis that all homosexuals will remain celibate or that they will not be sexually attracted to others. It would be similarly irrational for the military to ignore the obvious implications of placing people who are sexually attracted to each other in the same living quarters. As such, the policy is not based on irrational prejudices but on concrete, articulated concerns about privacy and sexual tension and the resulting impact on unit cohesion. The military is entitled to deference for its professional determination that these legitimate concerns would adversely impact our nation's military readiness.

Under the second prong of rational basis review, the Court must determine whether the means employed by the government are rationally related to the legitimate purpose of excluding those who engage in or demonstrate a propensity to engage in homosexual conduct from service in the military. In Count III, Lt. Thomasson argues that it is irrational to assume that because a service member makes a statement as to his or her sexual orientation that the member thereby has demonstrated a propensity to engage in prohibited sexual conduct. As the Court of Appeals for the District of Columbia Circuit recently noted in *Steffan v. Perry,* the government's presumption, as embodied in the DOD Directives, that statements as to sexual preference indicate a propensity to engage in sexual conduct is "certainly rational given that the human sexual drive is enormously powerful and that an open declaration that one is a homosexual is a rather reliable indi-

cation as to the direction of one's drive." *Steffan,* 41 F.3d at 690. Congress recognized that military policies properly take into account the sexual attractions that can exist between men and women, and "[s]imilar considerations apply to the development of policies with respect to homosexuality." S.Rep. No. 112, at 284, U.S.Code Cong. & Admin.News, at 2070. Indeed, advocates of gay rights have themselves linked homosexuality and homosexual acts in arguing against the criminalization of homosexual sodomy.[4] Further, the DOD need not be "compelled to engage in the sleuthing of soldiers' personal relationships for evidence of homosexual conduct in order to enforce its ban on homosexual acts." *Ben–Shalom,* 881 F.2d at 464. Even assuming some homosexuals may state their sexual preference yet not engage in prohibited conduct, when analyzing the constitutionality of a statute under rational basis review, especially in the arena of military affairs, Congress is entitled to deference and this Court is compelled "to accept a legislature's generalizations even when there is an imperfect fit between means and ends." *Heller,* ——— U.S. at ———, 113 S.Ct. at 2643.

It is asserted that the rebuttable presumption irrationally presumes that homosexuals who acknowledge their homosexuality will violate the law. The Supreme Court, however, has sanctioned the government's use of classifications based on identifiable characteristics as a proxy for conduct when making employment decisions. In *New York City Transit Auth. v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979), the Court upheld the Transit Authority's refusal to employ methadone users enrolled in a treatment program, finding that it is rational to assume that an addict might engage in unacceptable conduct while on the job. Like the regulation in *Beazer,* the instant regulation is, at bottom, a regulation governing employment in a profession with somewhat unique criteria.

Further, as the D.C. Circuit noted, service members like Lt. Thomasson "who identify themselves as homosexual in a military setting—where a declaration of homosexuality is a ground for discharge—convey the impression that they are not in doubt as to the direction of their sexual drive." *Steffan,* 41 F.3d at 691. This is particularly pertinent in the instant case because Lt. Thomasson refused to state whether or not he intended to engage in homosexual conduct.

In short, the government's use of a rebuttable presumption is an entirely rational means of effectuating the military's legitimate purpose of prohibiting individuals who engage in, or have a propensity to engage in, homosexual conduct from serving in the military. It is not within the province of the Court to second guess the government's decision, or indeed search for other motives or rationales. Rather, the Court, applying a "healthy deference to legislative and executive judgments in the area of military affairs," *Rostker,* 453 U.S. at 66, 101 S.Ct. at 2652, must simply determine whether the stated purpose is legitimate and the means rationally related to that purpose. In this case, the government has clearly articulated a legitimate purpose and has provided a means that is rationally related to the fulfillment of that purpose.

### DUE PROCESS AND THE ADMINISTRATIVE PROCEDURE ACT

Lt. Thomasson contends in Count V that the policy at issue violates his rights to due process and procedural fairness under the Fifth Amendment to the United States Constitution by (1) creating and applying a legal classification that is unconstitutionally overbroad; (2) applying a presumption that is in fact irrebuttable; and (3) imposing an irrebuttable presumption grounded on a class-based expectation. He also contends that the Navy's decision to discharge him was arbitrary, capricious, and unsupported by

---

4. As the Court of Appeals for the District of Columbia pointed out, the Lambda Legal Defense & Education Fund, a well-known gay rights advocacy group, argued in its amicus brief submitted to the Supreme Court in *Bowers v. Hardwick* that homosexual sodomy should not be criminalized because "the 'regulation of same sex behavior constitutes the total prohibition of an entire way of life' since homosexuality is inexorably intertwined with 'homosexual conduct.' " *See Steffan,* 41 F.3d at 690, n. 11.

substantial evidence in violation of the Administrative Procedure Act ("APA").

█ In contending that the Defendants have created and applied a legal classification that is unconstitutionally overbroad, the Plaintiff presumably means that the policy is overbroad in that it provides for discharge of members who may be homosexual but may not actively engage in prohibited homosexual conduct. The policy, however, provides for discharge of those members who cannot rebut the presumption that they will engage in such conduct based on their statements. The fact that some service members who state that they are homosexuals may have subjective intentions of remaining celibate does not make the statute overbroad. As previously mentioned, under rational basis review, a court is compelled to accept Congress' generalizations "even when there is an imperfect fit between means and ends." *Heller*, — U.S. at —, 113 S.Ct. at 2643.

█ The Plaintiff's next argument, that the presumption is in fact irrebuttable, is non-meritorious since, as mentioned previously, three service members thus far have been able to rebut the presumption after making statements relating to their homosexuality. Finally, the Plaintiff argues rather obtusely that "it violates due process to impose an irrebuttable presumption, which is rounded on a class-based expectation, on an individual, when that individual may prove an exception to the expected rule and the issue in question plainly calls for an individualized assessment." This policy provides for individualized assessment because the service member is afforded the opportunity to rebut the presumption and is afforded a full hearing on the merits. Again, the military is entitled to rely on reasonable inferences based on classifications to make employment decisions. *See Murgia*, 427 U.S. at 307, 96 S.Ct. at 2562 (holding that mandatory retirement age of 50 for police officers rationally furthers the government's purpose of assuring the physical preparedness of its police force).

It is for this reason that the policy also does not run afoul of the APA. The policy provides, and indeed Lt. Thomasson was given, a full hearing on the merits. There is substantial evidence in the record supporting the Navy's determination that Lt. Thomasson failed to rebut the presumption that he has a propensity to engage in homosexual conduct based on his statement.

Accordingly, the "Don't Ask Don't Tell" policy does not violate Lt. Thomasson's rights under the First Amendment, the Equal Protection Clause of the Fifth Amendment, the Due Process Clause of the Fifth Amendment, or the APA, either on its face or as applied to him. The Plaintiff's motion for summary judgment, therefore, should be denied and the Defendant's cross motion for summary judgment should be granted.

An appropriate order shall issue.

### ORDER

This matter came before the Court on cross-motions for summary judgment. For reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that Plaintiff's Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted and this case is dismissed.