Richard F. RICHENBERG, Jr., Plaintiff,

v.

William J. PERRY, Secretary of Defense, in his official capacity; Sheila Widnall, Secretary of the Department of the Air Force, in her official capacity, Defendants.

8:CV95–00393.

United States District Court, D. Nebraska.

Dec. 11, 1995.

1304

Susan A. Koenig-Cramer, Susan Koenig-Cramer, Omaha, NE, Thomas C. Kayser, Deborah J. Palmer, Charles O. Lentz, Randall Tietjen, Jana Kramer, Robins, Kaplan Law Firm, Minneapolis, MN, Lori L. Graesser, Lori Graesser, Omaha, NE, for plaintiff.

Paul D. Boeshart, Assistant United States Attorney, Lincoln, NE, Kevin M. Simpson, David J. Anderson, Vincent M. Garvey, U.S. Department of Justice, Civil Division, Washington, DC, Steven J. Pecinovsky, Lt. Col., United States Air Force, General Litigation Division, Arlington, VA, for defendants.

Steven J. Lefler, Lefler, Franklin Law Firm, Omaha, NE, for amicus curiae.

## MEMORANDUM OPINION

STROM, Senior District Judge.

This matter is before the Court on the parties' cross motions for summary judgment (Filing Nos. 31 and 32). Plaintiff Richard F. Richenberg, Jr., is a Captain in the United States Air Force stationed at Offutt Air Force Base ("Offutt AFB") near Omaha, Nebraska. Defendant William J. Perry is the Secretary of the Defense and defendant Sheila Widnall is the Secretary of the Department of the Air Force. Plaintiff filed this action requesting permanent injunctive and declaratory relief prohibiting defendants

from discharging him from the Air Force as a result of his statement that he is a homosexual. Plaintiff challenges the government's policy regarding homosexuals in the military primarily on the grounds that the policy on its face and as applied to him, violates his First Amendment freedom of speech and denies him equal protection of the laws guaranteed by the Fifth and Fourteenth Amendments. Plaintiff also alleges that the Air Force discharge proceedings violated the Administrative Procedures Act. Finally, plaintiff alleges that the policy is unconstitutional as a Bill of Attainder. The Court heard oral arguments on this matter on November 6, 1995. After careful consideration of the motions, the briefs and the applicable law, the Court makes the following findings and conclusions.

## THE POLICY

On January 29, 1993, President Clinton directed Les Aspin, Secretary of Defense at the time, to reevaluate the Department of Defense's ("DOD") policy regarding homosexuals in the military. Secretary Aspin commissioned two independent studies to evaluate the DOD's existing policy and to consider new policy options. Between March and July, 1993, the Senate and House Armed Services Committees held extensive public hearings on the matter. Pursuant to President Clinton's order, Secretary Aspin issued a new directive regarding homosexuals in the military on July 19, 1993. The Senate and House Armed Services Committees conducted further hearings and recommended that Congress enact the policy as contained in the July 19 directive. In November 1993, Congress enacted the policy as § 571 of the National Defense Authorization Act for Fiscal Year 1994, Pub.L. No. 103-160, 107 Stat. 1670-73 (codified at 10 U.S.C. § 654). President Clinton signed the policy into law on November 30, 1993.

In enacting the "Policy concerning homosexuality in the armed forces" Congress made extensive findings, including the finding that:

> (8) Military life is fundamentally different from civilian life in that—
>
> (A) the extraordinary responsibilities of the armed forces, the unique conditions of military service, and the critical role of unit cohesion, require that the military community, while subject to civilian control, exist as a specialized society; and
>
> (B) the military society is characterized by its own laws, rules, customs, and traditions, including numerous restrictions on personal behavior, that would not be acceptable in civilian society.

10 U.S.C. § 654(a). Congress also found that:

> (15) The presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability.

*Id.* The policy provides that a service member shall be separated from the armed forces if, pursuant to the regulations, one or more of the following is found:

> (1) That the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act or acts.
>
> (2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, unless there is a further finding, made and approved in accordance with procedures set forth in the regulations, that the member has demonstrated that he or she is not a person who engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts.
>
> (3) That the member has married or attempted to marry a person known to be of the same biological sex.

10 U.S.C. § 654(b).

On December 21, 1993, the DOD issued Directive 1332.30, titled "Separation of Regular Commissioned Officers" to implement the policy. The Directive defines "homosexual conduct" to include "a homosexual act, a statement by the Service member that demonstrates a propensity or intent to engage in homosexual acts, or a homosexual marriage or attempted marriage." Directive 1332.30 at 1-1. The Directive further provides:

> C. *HOMOSEXUAL CONDUCT*
>
> A statement by a member that demonstrates a propensity or intent to engage in homosexual acts is grounds for separation not because it reflects the member's sexual orientation, but because the statement indicates a likelihood that the member engages in or will engage in homosexual acts. A member's sexual orientation is considered a personal and private matter, and is not a bar to continued service under this section unless manifested by homosexual conduct in the manner described in section C.1.

*Id.* at 2–1. Section C.1. reiterates the three grounds for separation outlined by 10 U.S.C. § 654. Regarding the "statement" grounds, however, the Directive elaborates that:

> A statement by an officer that he or she is a homosexual or bisexual, or words to that effect, creates a rebuttable presumption that the officer engages in, attempts to engage in, has a propensity to engage in, or intends to engage in homosexual acts. The officer shall be advised of this presumption and given the opportunity to rebut the presumption by presenting evidence demonstrating that he or she does not engage in, attempt to engage in, have a propensity to engage in or intend to engage in homosexual acts. Propensity to engage in homosexual acts means more than an abstract preference or desire to engage in homosexual acts; it indicates a likelihood that a person engages in or will engage in homosexual acts.

Directive 1332.30 at 2–2. The Directive further provides that in determining whether an officer has successfully rebutted the presumption, the military may consider: (1) whether the officer has engaged in homosexual acts; (2) the officer's credibility; (3) testimony from others regarding the officer's past conduct, character and credibility; (4) the nature and circumstances of the of the officer's statement; and (5) any other evidence relevant to whether the officer is likely to engage in homosexual acts. *Id.* In conformity with Directive 1332.30, the Department of the Air Force amended its regulation AFR 36–2 regarding officer administrative discharge procedures. The pertinent portion of AFR 36–2 repeats much of the language contained in DOD Directive 1332.30, and together, shall be referred to as the "regulations." Section 654 and the regulations constitute the "policy" under which defendants seek to discharge plaintiff.

## FACTS

Since entering the Air Force in April 1985, plaintiff has served with distinction as an Electronic Warfare Officer ("EWO"). After serving a three-year tour of duty at Eielson Air Force Base in Alaska, plaintiff was transferred to Offutt Air Force Base in 1989. After serving in the Gulf War, plaintiff returned to Offutt AFB and was subsequently selected for the Foreign Military Sales ("FMS") program to train and support personnel in Saudi Arabia. Prior to going to Saudi Arabia, plaintiff was sent to Texas for FMS training. Towards the end of his training in Texas in April, 1993, plaintiff requested that his assignment to Saudi Arabia be canceled and that he be separated from the Air Force. This request was denied. In May, 1993, plaintiff faxed a letter to Lieutenant Colonel David G. Bell, his commanding officer at Offutt AFB, informing Lt. Col. Bell that he is homosexual. Lt. Col. Bell showed the letter to Lt. Col. David Trask who was about to assume Lt. Col. Bell's duties. At about the same time, plaintiff told a few friends and fellow officers that he was homosexual. (Pl's Br. at 20). The Air Force canceled plaintiff's assignment to Saudi Arabia and reassigned him to Offutt AFB.

As a result of his letter and statements, the Air Force initiated proceedings to discharge plaintiff. A Board of Inquiry conducted a hearing on the matter, and on December 2, 1993, recommended that plaintiff be discharged. Before the Air Force took final action on that recommendation, however, the Secretary directed that the case be reconsidered under the recently enacted policy regarding homosexuals in the military. The Air Force reinitiated discharge proceedings in April, 1994, and a second Board of Inquiry conducted a hearing in June, 1994. At the hearing, plaintiff read a sworn statement and testified that he had not in the past and would not in the future engage in any prohibited conduct. On June 21, 1994, the

Board of Inquiry recommended that plaintiff be discharged. Following the Board of Inquiry, the Air Force processed plaintiff's case through several procedural steps, including a Board of Review. At each stage, it was recommended that plaintiff be discharged. On August 28, 1995, the Secretary of the Air Force ordered that plaintiff be removed from active duty and issued an honorable discharge certificate.

The Air Force scheduled plaintiff's discharge for September 8, 1995. On September 5, 1995, plaintiff filed with this Court an amended verified complaint and a motion for temporary restraining order (Filing Nos. 4 and 5). On September 7, 1995, the Court conducted a hearing on the temporary restraining order. On September 8, 1995, the Court issued an order (Filing No. 14) and memorandum opinion (Filing No. 15) granting plaintiff's motion for TRO and setting an expedited schedule for cross motions for summary judgment which the Court now considers.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Summary judgment will not lie if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In order for the moving party to prevail, it must demonstrate to the Court that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A fact is material only when its resolution affects the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. A material issue is genuine if it has any real basis in the record. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). On a motion for summary judgment, the Court must view all evidence and inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. However, the nonmoving party may not rest on the mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. And if the plaintiff cannot support each essential element of his claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53. The Court reviews the parties' cross-motions for summary judgment in light of the foregoing standard.

## DISCUSSION

### (a) General Principles

Before addressing the merits of plaintiff's case, the Court must outline several principles which apply generally to plaintiff's constitutional claims. It is the sworn duty of federal courts to determine whether a statutory restriction unconstitutionally infringes on an individual's liberty. This duty is not discharged when the restriction arises in the context of military affairs. However, the "customary deference" which federal courts accord to congressional judgments is perhaps never more pronounced than when the "case arises in the context of Congress' authority over national defense and military affairs." *Rostker v. Goldberg,* 453 U.S. 57, 64–65, 101 S.Ct. 2646, 2651–52, 69 L.Ed.2d 478 (1981). This is because "[t]he constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping." *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Furthermore, courts have recognized their relative "incompetence" in the area of military affairs:

> [I]t is difficult to conceive of an area of governmental activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force are essentially pro-

fessional military judgments, subject *always* to civilian control of the Legislative and Executive Branches.

*Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 2446, 37 L.Ed.2d 407 (1973).

In *Rostker v. Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981), the Court discussed at length the tension between its "constitutional responsibility" and the appropriate deference to accord Congress in the military arena. The Court in *Rostker* was called upon to decide whether the Military Selective Service Act violated the Fifth Amendment Due Process Clause by denying equal protection of the laws in requiring only men to register for the draft. The Court noted that although judicial deference is "at its apogee" when considering Congress' authority to raise and support armies, "deference does not mean abdication." *Id.* at 70, 101 S.Ct. at 2654. The Court stated that while this deference does not "refine" the applicable constitutional tests, it "cannot ignore Congress' broad authority conferred by the Constitution to raise and support armies when we are urged to declare unconstitutional its studied choice of one alternative in preference to another for furthering that goal." *Id.* at 71–72, 101 S.Ct. at 2655–56. This is especially true when "Congress specifically considered the question of the Act's constitutionality." *Id.* at 64, 101 S.Ct. at 2651.

As in *Rostker,* Congress enacted the policy in the present case pursuant to Article I Section 8 of the Constitution. 10 U.S.C. § 654(a)(1)–(3). In addition, the policy "received considerable national attention," "was the subject of wide-ranging public debate," and was "extensively considered by Congress in hearings, floor debate, and in committee." *Rostker,* 453 U.S. at 72, 101 S.Ct. at 2655. Accordingly, the Court will evaluate the policy in light of the principles articulated in *Rostker.*

**(b) First Amendment**

Plaintiff alleges that the policy infringes on his First Amendment rights by imposing a content/viewpoint-based restraint on his freedoms of speech and association (Count VI).[1] Specifically, plaintiff argues that the policy "silences a group of speakers not only because of what they say but because of who they are," thereby "implicat[ing] the First–Amendment value of promoting individual dignity and integrity." (Pl.'s Br. at 40, 54). Accordingly, plaintiff argues that the policy is "presumptively invalid." *R.A.V. v. City of St. Paul,* 505 U.S. 377, 382, 112 S.Ct. 2538, 2542, 120 L.Ed.2d 305 (1992).

The Supreme Court has long recognized, however, that First Amendment challenges of military regulations are subject to a different analysis than in a civilian context:

> While the members of the military are not excluded from the protection granted by the First Amendment, the different character of the military community and of the military mission require a different application of those protections. The fundamental necessity for obedience, and the consequent necessity for imposition of discipline, may render permissible within the military that which would be constitutionally impermissible outside it.

*Parker v. Levy,* 417 U.S. 733, 758, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974). Accordingly, "[t]he rights of military men must yield somewhat 'to meet certain overriding de-

1. Plaintiff also alleges that the policy violates his right to equal protection under the laws as guaranteed by the Fifth and Fourteenth Amendments by restricting his exercise of the fundamental right to freedom of speech (Count II). The Court will consider plaintiff's equal protection claim based on the alleged denial of a fundamental right together with his substantive First Amendment claim since the governing standard will be same. *Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 666, 110 S.Ct. 1391, 1401, 108 L.Ed.2d 652 (1990); *Police Dep't of the City of Chicago v. Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972). *See also City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 55 n. 4, 106 S.Ct. 925, 933 n. 4, 89 L.Ed.2d 29 (1986) ("respondents can fare no better under the Equal Protection Clause than under the First Amendment itself"); and 3 Rotunda & Nowak, *Treatise on Constitutional Law: Substance and Procedure,* 2nd § 18.40 (1992) ("if [a court] finds that a classification regarding speech or associational rights does not infringe first amendment freedoms, it is likely to find that the classification does not violate equal protection because it has determined that the law does not constitute the improper allocation of a fundamental right").

mands of discipline and duty.'" *Brown v. Glines,* 444 U.S. 348, 354, 100 S.Ct. 594, 599, 62 L.Ed.2d 540 (1980) (citations omitted). Thus, "'[s]peech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected.'" *Parker,* 417 U.S. at 759, 94 S.Ct. at 2563 (quoting *United States v. Priest,* 45 C.M.R. 338, 344 (1972)).

The Court applied these principles in *Goldman v. Weinberger,* 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986), when considering whether an Air Force regulation prohibiting an Orthodox Jewish member from wearing a yarmulke violated the First Amendment. Giving "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest," the Court noted that personal identity in the military is subordinate to the "overall group mission." *Id.* at 507–08, 106 S.Ct. at 1313–14. In holding that the regulation did not violate the First Amendment, the Court stated:

> Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps. The essence of military service "is the subordination of the desires and interests of the individual to the needs of the service."
>
> . . . . .
>
> These aspects of military life do not, of course, render entirely nugatory in the military context the guarantees of the First Amendment. But "within the military community there is simply not the same [individual] autonomy as there is in the larger civilian community."

*Id.* at 507, 106 S.Ct. at 1313 (citations omitted).

Applying these principles to the present case, the Court concludes that the policy does not violate plaintiff's First Amendment rights. There is little doubt that the policy affects speech. But as the Seventh Circuit Court of Appeals recognized in addressing this very issue, "it does so only incidentally, in the course of pursuing other legitimate goals." *Ben–Shalom v. Marsh,* 881 F.2d 454, 462 (7th Cir.1989). The only restriction on plaintiff's speech is the ability to state that he is homosexual and the failure to rebut the presumption created by that statement. Although, this may result in a denial of self-identity, plaintiff's interests in autonomy and self-identity are subordinate to the military interests in good order and discipline, morale, unit cohesion and combat readiness. Thus while the presumption created by a statement of homosexuality may inhibit speech to a limited extent, the Court "cannot say that the infringement rises to the level of being unconstitutional." *Ben–Shalom,* 881 F.2d at 461. This is true especially in light of the deferential review of First Amendment challenges of military regulations. Accordingly, plaintiff's First Amendment claim and equal protection claim based on the denial of a fundamental right must fail.

**(c) Equal Protection**

Plaintiff alleges that the policy denies him equal protection of the laws by: (1) discharging him from the Air Force on the basis of his status as homosexual; (2) requiring him to rebut a presumption which does not apply to heterosexuals; and (3) discriminating against him on the basis of gender (Counts I, III and IV).

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws." Equal protection applies to federal actions through the Fifth Amendment Due Process Clause. *Schlesinger v. Ballard,* 419 U.S. 498, 500 n. 3, 95 S.Ct. 572, 574 n. 3, 42 L.Ed.2d 610 (1975). The equal protection analysis is identical under the Fifth and Fourteenth Amendments. *Weinberger v. Wiesenfeld,* 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975).

A threshold issue in equal protection analysis is determining whether to apply strict scrutiny, intermediate scrutiny, or rational-basis review. Plaintiff argues that strict scrutiny applies because the policy excludes homosexuals on the basis of status rather than conduct and because homosexuals constitute a suspect class. Plaintiff concedes that neither the Supreme Court nor the Eighth Circuit Court of Appeals has ever held that homosexuals constitute a suspect-class. However, plaintiff urges the Court to reach this conclusion based on the suspect-class criteria identified by the Supreme Court in *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16 (1973), and *Frontiero v. Richardson,* 411 U.S. 677, 684–86, 93 S.Ct. 1764, 1769–70, 36 L.Ed.2d 583 (1973). In the alternative, plaintiff argues that the Court should apply heightened scrutiny because the policy unfairly discriminates on the basis of gender, a quasi-suspect classification.

Five federal courts of appeals have uniformly determined that rational-basis review is the proper analysis to apply to equal protection challenges of the military's policy regarding homosexuals. *Steffan v. Perry,* 41 F.3d 677, 684 (D.C.Cir.1994) (en banc); *Meinhold v. Department of Defense,* 34 F.3d 1469, 1478 (9th Cir.1994); *Ben–Shalom v. Marsh,* 881 F.2d 454, 464 (7th Cir.1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Woodward v. United States,* 871 F.2d 1068, 1076 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); and *Rich v. Secretary of the Army,* 735 F.2d 1220, 1229 (10th Cir.1984). In light of this precedent and because "courts have been very reluctant, as they should be in our federal system" to create new suspect classes, the Court declines to extend suspect classification status to homosexuals. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 441, 105 S.Ct. 3249, 3255, 87 L.Ed.2d 313 (1985). In addition, plaintiff's attempt to obtain heightened scrutiny on the basis of gender discrimination must fail since the policy applies equally to male and female service members. Accordingly, the Court will apply rational-basis review to plaintiff's equal protection claims.

The standards for rational-basis review are familiar ones. A non-suspect classification is "accorded a strong presumption of validity" and "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe by Doe,* 509 U.S. 312, ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). The statute is presumed constitutional and the government has no obligation to produce evidence to sustain the rationality of the classification. *Id.,* at ——, 113 S.Ct. at 2643. Instead, the challenging party has the burden to " 'negative every conceivable basis which might support it.' " *Id.* (citations omitted). Classifications survive rational-basis review despite Congress' "generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.' " *Id.* (citations omitted). In short, "[i]t is hard to imagine a more deferential standard than rational basis, but when judging the rationality of a regulation in the military context, we owe even more special deference to the 'considered professional judgment' of 'appropriate military officials.' " *Steffan v. Perry,* 41 F.3d 677, 685 (D.C.Cir.1994) (quoting *Goldman v. Weinberger,* 475 U.S. 503, 509, 106 S.Ct. 1310, 1314, 89 L.Ed.2d 478 (1986)).

Under the rational-review analysis, the Court must first determine whether the policy is directed at the achievement of a legitimate governmental purpose. After months of public debate and extensive hearings, Congress expressed the purpose of the policy and the reasoned judgment of the Commander-in-Chief, the Secretary of Defense and the leaders of the military branches when it stated:

> (4) The primary purpose of the armed forces is to prepare for and to prevail in combat should the need arise.
>
> . . . . .
>
> (6) Success in combat requires military units that are characterized by high mo-

rale, good order and discipline, and unit cohesion.

10 U.S.C. § 654(a). It is difficult to conceive of more legitimate governmental concerns than matters of national defense and the safety and security of American military personnel. A policy designed to protect these interests by eliminating a potential threat to them is certainly aimed at a legitimate governmental purpose. This is especially true considering Congress' broad power to establish conditions and qualifications for service in the armed forces. Exercising this discretion, Congress has determined that due to the nature of military life, the presence of persons who demonstrate a propensity to engage in homosexual conduct presents an unacceptable risk to unit cohesion, morale, good order and discipline and military readiness. Thus, the policy of excluding from the military those who demonstrate a propensity to engage in homosexual conduct is directed at several and related legitimate governmental purposes.

Plaintiff argues that the policy is based on prejudice and that defendants' asserted justifications are invalid. The Court acknowledges, as did the court in *Ben–Shalom*, that there certainly is prejudice against homosexuals within the armed forces. However, the Court is called upon to determine the constitutionality of the policy—not its wisdom. That determination is for Congress to make as overseer of the military and the Court should not second-guess its authority in this area. As noted above, this principle applies with particular force when Congress has made a studied choice between alternatives and specifically considered the policy's constitutionality. As the Seventh Circuit reasoned in *Ben–Shalom v. Marsh*, 881 F.2d 454 (7th Cir.1989):

> [T]he Army should not be required by this court to assume the risk, a risk it would be assuming for all our citizens, that accepting admitted homosexuals into the armed forces might imperil morale, discipline, and the effectiveness of our fighting forces.... We, as judges, although opponents of prejudice of any kind, should not undertake to order such a risky change with possible consequences we cannot safely evaluate.

*Id.* at 461. Accordingly, plaintiff's argument must fail.

The Court must next inquire whether the policy rationally furthers these purposes. Plaintiff argues that the presumption created by a statement of homosexuality is irrational and impermissibly discriminates on the basis of homosexual orientation or status and not on the basis of conduct.[2]

The Court concludes, as have other courts, that the military may rationally and reasonably infer from a statement of homosexuality that a member has a propensity to engage in homosexual conduct. For example, in *Ben–Shalom, supra*, the plaintiff was an Army reservist who was denied reenlistment due to her statement that she was a lesbian. The plaintiff challenged the Army regulation as creating a classification based on status and not conduct. Rejecting this argument, the court held that "the regulation does not classify plaintiff based merely upon her status as a lesbian, but upon reasonable inferences about her probable conduct in the past and in the future." 881 F.2d at 464. The court reasoned that the plaintiff's "forthright admission" of homosexuality "reasonably implies, at the very least, a 'desire' to commit homosexual acts." *Id.* at 460. The court added:

> Plaintiff's lesbian acknowledgement, if not an admission of its practice, at least can rationally and reasonably be viewed as reliable evidence of a desire and propensity to engage in homosexual conduct. Such an assumption cannot be said to be without individual exceptions, but it is compelling evidence that plaintiff has in the past and is likely to again engage in such conduct.

*Id.* at 464.

Similarly, in *Steffan v. Perry*, 41 F.3d 677 (D.C.Cir.1994) (en banc), the plaintiff was discharged from the Naval Academy solely on the basis of his statement that he is

2. There is no doubt that the military may constitutionally prohibit homosexual conduct. *Meinhold v. Department of Defense*, 34 F.3d 1469, 1477 (9th Cir.1994); *Dronenburg v. Zech*, 741 F.2d 1388, 1398 (D.C.Cir.1984); *Beller v. Middendorf*, 632 F.2d 788, 812 (9th Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981).

homosexual. The court noted that "[h]omosexuality, like all forms of sexual orientation, is tied closely to sexual conduct," and that to pretend otherwise " 'borders on the absurd.' " *Id.* at 689–90 (citations omitted). Thus, "the military may reasonably assume that when a member states that he is homosexual, that member means that he either engages in or is likely to engage in homosexual conduct." *Id.* at 686. And while it is conceivable that a person would describe himself as homosexual despite the absence of any ongoing conduct or probability of such conduct, the fact that there may be exceptions is irrelevant "so long as the classification (the regulation) in the run of cases furthers its purpose, and we readily conclude that it does." *Id.* Accordingly, the court held that the policy of discharging members who admit to being homosexual rationally furthers the legitimate interest of banning persons who have a propensity to engage in homosexual conduct, especially considering that "the human sexual drive is enormously powerful and that an open declaration that one is homosexual is a rather reliable indication as to the direction of one's drive." *Id.* at 690. Thus, the plaintiff's claim "that the government cannot rationally infer that one who states he or she is a homosexual is a practicing homosexual, or is at least likely to engage in homosexual acts, is so strained a constitutional argument as to amount to a basic attack on the policy itself." *Id.* at 693.

Thus, the Court concludes that the use of a rebuttable presumption is a rational means of furthering the military's legitimate purpose of prohibiting service members who demonstrate a propensity to engage in homosexual conduct from serving in the armed forces. It is of no constitutional consequence that the plaintiff may in fact have no propensity to engage in homosexual conduct. As stated above, under rational-basis review, the military need not create an exact fit between its policy and the goal sought to be achieved. Because the policy generally advances its purpose, the Court concludes that plaintiff's equal protection challenges must fail.

**(d) Due Process**

Plaintiff also alleges that the policy violates due process and procedural fairness (Count V). Specifically, plaintiff argues that the presumption is simply irrational and that it, in effect, creates an irrebuttable presumption. This claim is without merit. As discussed above, the military may constitutionally infer from a statement of homosexuality that a service member has a propensity to engage in homosexual conduct. In addition, seven service members thus far have successfully rebutted the presumption. A service member is afforded a full hearing and opportunity to rebut the presumption. Whether the member successfully rebuts the presumption is determined on an individual basis. Finally, the Court agrees with defendants' assertion at oral argument that there is no guarantee to the service member that what he or she offers at the hearing will be accepted.

**(e) Right of Privacy**

Plaintiff alleges that the policy infringes on his constitutionally protected right of privacy (Count VII). Several courts have rejected this argument in challenges to the military's former policy regarding homosexuals. *Schowengerdt v. United States,* 944 F.2d 483, 490 (9th Cir.1991) *cert. denied* 503 U.S. 951, 112 S.Ct. 1514, 117 L.Ed.2d 650 (1992); *Woodward v. United States,* 871 F.2d 1068, 1075 (Fed.Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990); *Dronenburg v. Zech,* 741 F.2d 1388, 1391–98 (D.C.Cir.1984); *Rich v. Secretary of the Army,* 735 F.2d 1220, 1228 (10th Cir. 1984). In addition, while not explicitly ruling on the issue of privacy, the court in *Ben-Shalom v. Marsh,* 881 F.2d 454 (7th Cir. 1989), observed that:

> The privacy expectations of a civilian, wherever their outer limit may be, cannot be compared to the substantially more limited privacy expectations accompanying military life. Plaintiff in the present case voluntarily sacrificed much personal privacy and liberty by deliberately seeking to be in the Army where privacy and liberty are necessarily at a premium.

*Id.* at 465. Finally, the Court agrees with the reasoning in *Rich, supra,* that even if the policy does implicate plaintiff's privacy interests, they are outweighed by the military's

legitimate interests articulated above. 735 F.2d at 1228. Accordingly, plaintiff's claim that the policy denies him of his right to privacy must fail.

**(f) Bill of Attainder**

Plaintiff asserts that the Act (10 U.S.C. § 654) constitutes a bill of attainder proscribed by Article I, § 9, Clause 3 of the United States Constitution (Count VIII). That section provides that: "[n]o bill of attainder or ex post facto law shall be passed."

A bill of attainder is a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial. *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 468, 97 S.Ct. 2777, 2802, 53 L.Ed.2d 867 (1977). Thus, there are three factors which determine whether a particular piece of legislation constitutes a bill of attainder: (a) whether the statute identifies an individual or individuals or easily ascertainable members of a group, (b) whether the statute inflicts punishment and (c) whether the punishment has been inflicted without a judicial trial. All three factors must be met. Because the Court finds that the policy as stated in 10 U.S.C. § 654 does not "inflict punishment" within the meaning of the bill of attainder clause, factors (a) and (c) will not be considered.

In *Selective Svc. Sys. v. Minn. Pub. Int. Res. Gp.*, 468 U.S. 841, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984), the Supreme Court stated:

> In deciding whether a statute inflicts forbidden punishment, we have recognized three necessary inquiries: (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes" and (3) whether the legislative record "evinces a congressional intent to punish." *Nixon, supra,* at 473, 475–476, 478, 53 L.Ed.2d 867, 97 S.Ct. 2777.

*Id.* at 852, 104 S.Ct. at 3355. The military policy pertaining to homosexuality does not fall within the historical meaning of legislative punishment. As noted in *Selective Svc. Sys.*, bills of attainder at common law often imposed death penalty and lesser punishments including imprisonment, banishment, and the punitive confiscation of property. *Id.* The Court noted that "in our own country, the list of punishments forbidden by the Bill of Attainder Clause has expanded to include legislative bars to participation by individuals or groups in specific employments or professions." *Id.* at 852, 104 S.Ct. at 3355. However, in this case, homosexuals are not barred from the Air Force simply because they are homosexuals. In this respect, this case is quite similar to the Selective Service case where the Court noted: "A statute that leaves open perpetually the possibility of qualifying for aid does not fall within the historical meaning of forbidden legislative punishment." *Id.* at 853. That case involved application for aid benefits under Title IV, which was tied to the applicants having properly registered with the Selective Service System. Here, the statute leaves open the possibility of qualifying for continued service in the Air Force when the person who has declared him or herself to be a homosexual overcomes the presumption that he or she does engage in, attempt to engage in, have a propensity to engage in, or intend to engage in homosexual acts.

Further, the policy is not concerned with somehow singling out homosexuals for punishment. The history behind the policy does not "evince an intent to punish" homosexuals. Indeed, maintaining the discipline and morale of the armed services is a compelling governmental interest justifying the adoption of the policy.

Finally, this is not a new restriction placed upon members of the Air Force. The policy of the Air Force has long barred participation by homosexuals. This statute, in fact, moderates the prior policy by prohibiting discharge simply on the basis of status, and permits the service member to rebut what formerly was an irrebuttable presumption of the Air Force.

For these reasons, the Court rejects plaintiff's contention that the statute is proscribed by the provisions of the Constitution prohib-

iting Congress from enacting bills of attainder.

**(g) Administrative Procedures Act**

Plaintiff contends that the decision to discharge Captain Richenberg violates the Administrative Procedures Act (Count IX). His first claim is that "the decision ... to discharge Captain Richenberg simply on the basis of his statement that he is gay violates the Administrative Procedures Act." His second contention is that the decision of defendant Widnall is arbitrary and capricious, contrary to law and unsupported by substantial evidence.

Regarding his first contention, plaintiff contends that the Act and Regulations only authorize discharge proceedings for statements when a service member makes a statement that "demonstrates a propensity or intent to engage in homosexual acts," citing Directive 1332.30 at 1–1. That section defines homosexual conduct to include "a statement by the Service member that demonstrates a propensity or intent to engage in homosexual acts." However, the plaintiff ignores the operative provisions of 1332.30(C)(1)(b), quoted *supra*, at 1307.

The Court has already addressed the validity of this presumption. While this may not be a wise policy, policy-making is not for the courts. Having found that the military may adopt such a policy effectively disposes of this contention.

The second contention is that the decision to discharge him based upon the Board of Inquiry hearing is arbitrary and capricious, contrary to law, and unsupported by substantial evidence. Plaintiff cites 5 U.S.C. § 706(2)(A–F) as the basis for these objections. That section of the United States Code deals with the scope of review of an agency action and states in part that the reviewing court shall hold unlawful and set aside any agency action found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege or immunity; ... (E) unsupported by substantial evidence...." The Court has already disposed of Factor (B) and will not address it again.

This administrative discharge was initiated pursuant to AFR 36–2, adopted by the Department of the Air Force effective October 1, 1984, and a Board of Inquiry was convened by Special Order A–010 (Government Exhibit 1). The authority for the convening of a Board of Inquiry is premised on 10 U.S.C. § 1182. The Board of Inquiry convened on June 20–21, 1994. Plaintiff and the government both presented evidence, resulting in a decision in which the Board recommended that plaintiff be removed from active duty with an honorable discharge. This recommendation was reviewed by a Board of Review and subsequently by the Secretary of the Air Force, both of whom approved and adopted the recommendation of the Board of Inquiry. The Secretary directed that the plaintiff be given an honorable discharge from the United States Air Force. The standard of review of this agency action has been set forth by the United States Court of Appeals for the Eighth Circuit in *Oglala Sioux Tribe of Indians v. Andrus,* 603 F.2d 707, 713 (1979), as follows:

> We turn now to the merits of the case. The scope of judicial review of agency action has been set forth by the Supreme Court in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The reviewing court must first decide whether the agency acted within the scope of its statutory authority. *Id.* at 415, 91 S.Ct. 814. If it has, the court must then determine whether its actual choice was "arbitrary, capricious, an abuse of discretion, or otherwise no in accordance with law." *Id.* at 416, 91 S.Ct. at 823, quoting 5 U.S.C. § 706(2)(A). *See CPC International Inc. v. Train,* 515 F.2d 1032, 1043–1044 (8th Cir.1975), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977).

This inquiry necessarily involves a review of the decision of the Board of Inquiry which is the basis for the decision of the Board of Review and the Secretary. The Court believes that the appropriate standard of review of the action of the Board of Inquiry is governed by "the substantial evidence" test. *See Castillo v. Army & Air Force Exchange Service,* 849 F.2d 199 (5th Cir.

**1316**

1988). The "substantial evidence" test for review is a narrow one, and the reviewing court is not to substitute its conclusion for those of the agency. Furthermore, the possibility of drawing inconsistent conclusions from the evidence does not mean that the agency's findings are unsupported by substantial evidence. *See Erickson Transport Corp. v. ICC,* 728 F.2d 1057 (8th Cir.1984).

The Court has reviewed the entire transcript of the hearing before the Board of Inquiry. (Pl.'s Ex. C–1). The Court keeps in mind that in applying this standard of review, it is not to determine whether or not it would have decided the matter in the same manner as the Board of Inquiry but rather whether there is substantial evidence supporting the Board's finding. As the parties noted in their closing arguments, the issue boils down to a question of credibility. The Board of Inquiry had the opportunity to observe the witnesses and to review the evidence presented, and the Court finds that its decision is supported by "substantial evidence" as that term is used in the statute and in the cases applying that standard of review. Accordingly, the Court also finds that the decision of the Secretary is not arbitrary or capricious or an abuse of the Secretary's discretion.

## CONCLUSION

The military's policy regarding homosexuals in the armed forces contained in 10 U.S.C. § 654 and the implementing regulations does not violate plaintiff's rights under the United States Constitution or under the Administrative Procedures Act. Accordingly, plaintiff's motion for summary judgment will be denied and defendants' motion for summary judgment will be granted. The Court will enter a separate order in accordance with this opinion.